Casey, C. J.,
delivered tbe opinion of tbe Court.
These claimants, between November, 1847, and July, 1854, imported into tbe United States, at tbe ports of Boston and New York, a large quantity of iron and steel, from tbe kingdom of Sweden. They aver, in their petition, that tbe iron and steel so imported were invoiced in Sweden, in tbe paper currency issued by tbe State Bank of Sweden, and known as the “ Rix daler Banco,” and recognized as legal currency by the laws of that kingdom, with a fixed legal value; that it was a component part of tbe specie dollar of that country — two and two-thirds Rix dalers Banco being equal to one specie dollar.
It is further averred that by the act of Congress of the 22d May, 1846, the value of the specie dollar of Sweden and Norway is fixed at one hundred and six cents federal currency, and that the true value of the Rix daler Banco was thirty-nine and three-fourths cents of the money of the United States. It was also set forth that the American consuls erroneously treated the Rix daler Banco as depreciated currency, and adding thereto the indirect rate of exchange, certified its value to be from forty-two cents in the money of the United States.
By tables annexed to the petition of the claimant it is shown that these erroneous certificates enhanced the valuation of their importations to the amount of thirty-two thousand five hundred and twenty-five dollars and forty-one cents, ($32,525 41,) and made tbe excess of duty paid thereon, nine thousand six hundred and nine dollars and seventy- *17 eight cents, ($9,609 78.) They further aver that this last-named amount was improperly assessed upon their importations, and illegally exacted from them, and that it was paid by the collectors into the treasury of the United States, and that they are entitled to recover it as money had and received to their use. They further state that these duties were paid by them without protest, and do not allege that any objection whatever was made to their payment. To this petition the solicitor for the United States has demurred, and has assigned as cause of demurrer — -
1st. That this court has not jurisdiction, inasmuch as Congress has, by the act of 26th February, 1845, provided that suits in such cases may be brought against the collectors, and that the remedy thus provided excludes all others.
2d. That no protest, as required by that act, was made against the payment of the duties claimed to be recovered back.
3d. That there is no cause of action set forth in the petition.
This demurrer, of course, admits the facts as set forth in the petition, and it must, therefore, be conceded, as alleged, that the duties specified were not properly chargeable.
1st. The'first question is, has this court jurisdiction of the claim as presented! Being a claim against the United States, founded on the acts of Congress regulating the imposition and collection of duties on imports — on the regulations of the Treasury Department in reference to the same subject — and based upon an implied promise to repay as money erroneously exacted, it appears to us that it comes within the provisions of the acts conferring our jurisdiction. We also think that a case might arise under the act of 26th February, 1845, in which an action could be sustained in this court against the United States, to try the legality and validity of the duties demanded and paid.
2d. Can there be a recovery against the United States in this court without the written protest required by the act of 1845 ! Under this act many cases have arisen in the circuit courts, and in the Supreme Court of the United States, against collectors to recover duties alleged to have been illegally exacted, and it has been uniformly held that its conditions and provisions, in regard to protest, must be substantially complied with. In a very recent case, the Supreme Court has held that the act was applicable to the case of duties paid between the passage of the act of 3d March, 1839, and the date of its enactment, upon the ground that he who would avail himself of its benefits must comply with its conditions. (Curtis’s Adm’x v. Fiedler, 2 Black, 461.) *18 And, so far as suits against collectors are concerned, the question must be considered at rest. But it still remains to be determined whether the act requires a similar protest to enable a party to maintain a suit directly against the United States. We are of opinion that such a protest is as necessary to maintain the suit against the United States, in this court, as when the collector is defendant; and we shall now proceed to state briefly some of the reasons which have directed us to this conclusion.
We regard the suit authorized by the act to be brought against the collector as a suit virtually against the United States. The act of Congress approved March 3, 1839, required the collectors to pay all moneys received by them for unascertained duties, or for duties paid under protest, into the treasury of the United States. In consequence of this enactment, the Supreme Court of the United States, in the case of Cary v. Curtis, (3 How. 236,) held that no action would lie against the collector to recover for excess of duties imposed or illegally exacted. That act having mado it their duty to pay over all such money, they were held to be discharged from all liabilities inconsistent with that duty.
That act, and the interpretation put upon it by the Courts, left the importers without any remedy, except to apply to the Secretary of the Treasury to refund to them duties illegally exacted by collectors, or to petition Congress for relief in each case. There was no mode by which they could appeal to the judicial tribunals of the country. It was, in our judgment, to supply this want, and to devise a method of securing a judicial decision between the government and the importer, that Congress enacted the statute of February 26, 1845. Such was the view taken of this statute by Mr. Chief Justice Taney, in the case of Mason & Tullis v. Kane, in the Circuit Court of the United States for the district of Maryland, where he says : “ For this suit, although in form against the collector for doing an unlawful act, is in truth, and substantially, a suit against the United States. The money is in the treasury, and must be paid from the treasury if the plaintiff recover. And as the United States cannot be sued and made a defendant in a court of justice without their consent, they have an undoubted right to annex to the privilege of suing -them any condition which they deem proper. And in the exercise of this power, they have granted this privilege in the form of a suit against the collector, where duties are supposed to be overcharged, upon condition that the claimant, when he pays the money, shall give a written notice that he regards the demand *19 as illegal, and means to contest tlie right in a court of justice; and stating also, at the same time, distinctly, the specific grounds upon which he objects. This is'the condition upon which he is permitted to sue the collector, and thus to appeal from the administrative to the judicial department of the government. It is a condition precedent.”
The views expressed by the Chief Justice in the opinion just quoted effectually dispose of the assumption that the act was intended as a protection to the collectors. But at the time of the passage of this act •the collectors needed no protection; they enjoyed immunity from suit and from liability for anything relating to the collection of duties. If such had been the purpose contemplated by its framers, a mere verbal protest, or a general objection, would have sufficiently apprised them of the intention of the importer to contest the legality of the exaction of the duty, and have put them on their guard, so that they might secure themselves from loss or injury in the matter. In such a case, and for such a purpose, it would scarcely have been deemed necessary to require that the protest should be in writing, and signed by the claimant; that it should be at or before the payment of the duties, and should so distinctly point to the specific ground of objection that there could be no mistake in relation to the very ground upon which .he placed his notice of suit. But if we regard the act as putting the collector in the place and stead of the United States, and the action as being, in the language of Chief Justice Taney, “substantially between the government and the importer,” the objects and purposes of the enactment are perfectly plain and apparent. The suit becomes, then, as the statute itself expresses it, an “action at law against such collector, or other person acting as such, to ascertain and try the legality and validity of such demand and payment of duties.” The only parties who can have any interest in that question are the government and the importer. The collector has no private or personal interest in the question. But because the United States could not be impleaded in the courts, and because it may have been thought impolitic or improper to permit such a suit to be instituted against the United States, the officer concerned in the management of the particular affairs to which the act relates is substituted in their place. No person doubts that where the collector, under the direction of the Treasury Department, exacts a duty, and the importer makes the protest, brings his suit, and recovers a judgment, which is paid by the collector, that he would be entitled to recover it from the United States, or defalk its amount, in a suit brought by the latter to recover from him other *20 money received by him in his official capacity. Such has been the understanding of the department and the collectors, and such the usage ever since the passage of the act; all acting upon the understanding and belief that in all such suits the collector is the nominal and the United States the real defendant. The protest is required to warn the officers of the government that the payment of the duties will be contested. It is required to be signed by the claimant, to show that the objection is interposed by a person having a legal right to do so; it is to be made at or before the payment of the duties, and while the goods are still in the possession of the government, and to point out distinctly and specifically the objection, so that the facts necessary to the defence of the government and the correct decision of the case can be ascertained with almost unfailing certainty. If the objection relates to the kind, quality, or amount of goods imported, those matters can then be ascertained by inspection, by weighing, measuring, gauging, enumeration, or appraisement, and thus almost every error of fact that can b'e alleged against the right to demand the duty can be ascertained almost to a demonstration, and with little trouble and expense. If the objection is one of law, it is equally important that it should be distinctly specified. The collector can then revise his first decision, take legal advice upon the subject, or procure the instructions of the Secretary of the Treasury upon the very point. Bnt it was also intended, in case of a suit, to limit the importer to the grounds distinctly and specifically set forth in the protest. Upon these the government and its officers may be presumed to be prepared. If it were otherwise, an action of general indebitatus assumpsit, for money had and received, might'be instituted against the collector, and when the government came prepared to defend one transaction and one state of facts, it might then find a recovery claimed in regard to matters and things entirely different, involving other facts and different principles. Against such general and roving claims the act was intended to guard, not only by requiring the protest, but by confining the party to the objections it contains.
Let us look for a moment at the effect which a decision such as we are now asked to make would produce. There has been heretofore no. statute of limitations barring claims against the government. If this suit can be sustained, why may not a suit be founded upon every importation that has been made into the country for twenty or thirty years back? Why may not every one of the hundreds of thousands of cases of importations be torn up and overhauled in a suit brought *21 in this court'? For the great majority of those transactions stand, doubtless, just like this: The duties were paid, not only without protest, but without any sort of objection, and under the impression and belief of both the importer and the officers of the government that they were properly and legally demanded and paid. If all this can be done after the officers who superintended these collections are out of office or in their graves, when the evidence which might have availed is lost by the efflux of time, or unknown to those whose duty it is to defend these cases, the lot of the government is hard indeed. Deriving, as this nation does, its principal revenues for the ordinary and current expenses of the government from customs, such a course of decision would derange and demoralize our whole financial system. The officers of government could never make any reliable estimate of its means or its liabilities. No Secretary of the Treasury could tell how much of the revenue he had collected in one quarter would be recovered from him by suit in the next, how much of the current year’s revenues would be required to pay judgments obtained for alleged mistakes or errors committed twenty years ago. Such a financial system would be hazardous, if not certainly ruinous, to the credit of the best^exchequer on earth. And we cannot think that such disorder and confusion were what Congress intended to inaugurate by the passage of the act of 1845, and the acts organizing and establishing this court.
The encouragement that such a construction would give to litigation, and the temptation it would hold out to fraud and peijury, in establishing stale claims upon the government, would be a reason of some weight for believing that Congress did not intend, by the passage of the acts in reference to the Court of Claims, to relieve parties in this situation* from the conditions imposed by the act of 1S45.
The main argument relied on in support of this class of cases has been that the United States have in their treasury the money of these claimants, illegally imposed and exacted from them, and that it is against equity and good conscience to retain it. It would, perhaps, be sufficient to say that this argument is based on a proposition that is by no means admitted, and that we think cannot be proved, and that is the assumption that these duties were illegally exacted. To show that it is without foundation, we need but refer to the opinion of the Supremo Court, as delivered by Mr. Chief Justice Taney, in the case of Lawrence v. Caswell, (13 How., 488,) in which he says: “But it is proper to say, that the opinion of the court may not be misunderstood, that when we speak of duties illegally exacted, the court mean *22 to confine the opinion to cases i like the present, in which tlie duty demanded was paid under protest, stating specially the ground of objection. Where no such protest is made, the duties are not illegally exacted in the legal sense of the term, for tbe law bas confided to tbe Secretary of tbe Treasury tbe power of deciding in tbe first instance upon tbe amount of duties due upon tbe importation, and if tbe party acquiesces, and does not by bis protest appeal to tbe judicial tribunals, tbe duty paid is not illegally exacted, but is paid in obedience to tbe decision of tbe tribunal to wbicb tbe law bas confided tbe power of deciding tbe question.
“Money is often paid under tbe decision of an inferior court, without appeal, upon tbe construction of a law wbicb is afterwards, in some other case, in a higher and superior court, determined to have been an erroneous construction. But money thus paid is not illegally exacted ; nor are duties illegally exacted where they are paid under tbe decision of tbe collector, sanctioned by tbe Secretary of tbe Treasury, and without appealing from that decision to tbe judicial tribunals by a proper and legal protest; nor are they within tbe principle decided by the court in tbe case before us.”
This case, both by the authority which it bears, as the deliberate opinion of tbe highest judicial tribunal in the country, and tbe unanswerable reasons upon wbicb it is based, must, and ought to be, regarded as an end of this controversy. Tbe action of tbe collector in tbe assessment and exaction of tbe duty, under tbe instructions of tbe Secretary of tbe Treasury, is regarded and held by tbe Supreme Court as tbe decision of an inferior tribunal, appointed and authorized by tbe law to decide in tbe first instance. From that decision tbe act of 1845 authorizes an appeal, by tbe importer, to tbe courts of tbe country, upon complying with certain conditions required in tbe, act. If tbe importer does not appeal, or attempts to do so without complying with tbe stipulated conditions, in either case tbe decision of tbe inferior tribunal becomes final and conclusive, and we think it would be difficult to find any recognized judicial authority wbicb would allow its conclusiveness to be questioned in any other suit by either of the parties. This case of Lawrence v. Caswell meets every point of the argument founded upon or derived from tbe alleged illegality of tbe exaction of tbe duty sought to be recovered back, so that nothing further need, or, indeed, can well be, added to its force and conclusiveness. It demonstrates that tbe money bas not only not been illegally extorted from tbe claimant, but that it was a payment made in obe *23 dience to and in strict accordance with the law, and according to the arbitrament of those public functionaries to whom the laws of the land intrusted the decision of such cases. That the claimants have not availed themselves of the proper steps required by law to secure a judicial investigation and determination of the matter is entirely owing to their own neglect. They will scarcely set that up as any ground of recovery.
But it is said that it does not comport with the dignity of this government, nor with the duty it owes to the citizen, to set up a mere technical objection like this to bar a recovery of money paid that was not owing to it. After the views we have already expressed in this opinion, we need scarcely add that we do not regard the defence of want of protest as a mere technical one, but as one of substance and merits, and founded upon the highest considerations of public policy, convenience, and justice. In granting to the importer the right in any case to contest with the government the rate, amount, or legality of the duty imposed, before the courts of the country, it was clearly competent to couple its exercise with a reasonable and proper condition. And if it was right and proper to make such a condition, it surely cannot be wrong to enforce it. The claimant must see, in every such instance, that his failure results, not from either injustice or harshness on the part of the government, but solely from his own negligence. In the case of Bend v. Hoyt (13 Peters, 263) the Supreme Court of the United States applied this doctrine of negligence, even before the passage of the act of 1845, to an importer who had his goods entered as cotton gloves, and paid the duties as s,uch upon them. Some months afterwards he alleged that one or more of the packages contained silk hose, which were entitled to admission free of duty, and brought suit against the collector to recover back the duties so paid.
Mr. Justice Story, m delivering the opinion of the court, says:
“ The error, if any there has been, has arisen, as we have already stated, from his (the plaintiffs) own negligence; and courts of justice do not sit for the purpose of aiding those who seek redress for supposed mischief resulting from such negligence. Even courts of equity will not interfere to assist a party to obtain redress for an injury which he might by ordinary diligence have avoided; and, a fortiori, a court of law ought not, where the other party has, by the very acts or omissions, lest his own proper rights or advantages.”
Some stress has been laid on the second section of the act of August S, 1846, authorizing the Secretary of the Treasury to refund to im *24 porters “ such sums of money as have been illegally exacted by collectors of the customs, &c., since the 3d of March, 1833.” The provisos to the section require that before the Secretary refunds he shall be satisfied, by decisions of the courts of the United States upon the principle involved, that such duties were illegally exacted, and that such decisions shall bo adopted or acquiesced in by the Treasury Department. The claimants contend that if the Secretary may refund such duties without protest, a fortiori the court may entertain a suit for the purpose, and that the proviso requires a judicial decision on the principle involved before the Secretary can allow it, and that no decision can be made unless the courts will entertain the suits.
The first section of this act directs the Secretary of the Treasury to refund to certain merchants or importers named therein the excess of duties by them respectively paid. The second section is then added to embrace similar cases to those specifically provided for in the first section. This act, we think, in both sections is entirely retrospective; that the Secretary was only authorized by the act to refund such sums of money “as have been illegally exacted,” and not such .as might thereafter be illegally exacted; and that the reference to the courts in the provisos was in restraint of the authority of the Secretary of the Treasury, and not for the purpose of enlarging the jurisdiction of the courts. We think it did not repeal or interfere with the act of 1845, except so far as it related to the power of the Secretary of the Treasury to refund in cases where he was entirely convinced, by the judicial determination of the questions, that an excess of duty had been imposed between the 3d of March, 1833, and the date of the act. As to all cases occurring after the date of its passage, it left them subject to all the requirements and provisions of the act of 1845.
We think, also, that the view we have taken of the intention of the legislature in the passage of the act of 1845 is confirmed by the system adopted, or rather completed, in the act of the 3d of March, 1857, section 5, (11 Stat., 195.) By that act the decision of the collector imposing a duty upon any goods is made final and conclusive, unless the importer shall, within ten days after the entry of the goods, give notice to the collector, in writing, of his dissatisfaction with such decision, and shall set forth in such notice, distinctly and specifically, his grounds of objection, and shall, within thirty days after the date of the decision, appeal to the Secretary of the Treasury; and the decision of the Secretary of the Treasury to be final and conclusive, unless suit he brought within thirty days after the date of th# decision. These provisions are *25 blit the filling up and completion of a system the principles and outlines of which were contained in the act of 1845.
In every light, therefore, in which we can view this matter, wo regard the protest as essential to the maintenance of the suit, and the want of it fatal to the claimánt’s right to recover in this case.
*. There remains another question; and that is, whether the payment in this case was a-voluntary one — whether the money was paid under a mutual mistake of the law. The distinction attempted to be drawn t between ignorance, and mistake of law, and holding that money paid . in ignorance is irrecoverable, while that paid under mistake or miscon- . struetion may be sued for and recovered back, is a refinement too subtle < to be applied to the every-day business of life. Besides, we should ' find it in most cases very difficult to ascertain, with any'degree of -, certainty, whether the error arose from ignorance or misconception. ' And the very misinterpretation alleged might be the result of ignorance of law in general, or the rules of its interpretation and application.
It is contended that, because these were payments to public officers, who had the merchandise of the claimants in their hands, and that they were compelled to pay what was demanded in order to obtain the possession of their goods, that therefore these payments could not be voluntary ones. It is true, where money not demandable of right is claimed colore officii, and where the other party objects to its payment, but pays it to obtain the release of his goods, the payment is in no sense a voluntary one. It is clearly compulsory. But where a public officer, with the goods in his hands, presents an account as due, and the other acquiesces in its justice and amount, both believing at the. time that the debt is justly and legally due, and the party pays the same, and it afterwards turns out that there was an overpayment, owing to a mutual mistake or misinterpretation of the law under which this payment was made, such a payment has always been held to be a voluntary payment, and cannot be recovered back. Such is the state of facts in the case in hand. The amount paid was believed by both the parties to be the true amount chargeable upon the importations; there was no withholding of the goods to extort payment; no objection made; no official oppression; and the parties stood upon a footing of equality. The claimants presented to the collectors their invoices of importations, with the consular certificates upon them, which are now alleged to be erroneous, and out of which the alleged mistake ■ arises; and, upon the data so presented by themselves, the officers of. government made the assessment of duties, and they were paid and *26 received, in good faith. The error, it is said, consisted in misapplying the provisions of the act of March 2, 1799, in relation to consular certificates, and the act of May, 22, 1846, regulating the value of foreign coins, and this constitutes, as we conceive, an undoubted case of voluntary payment.
It would he useless in this opinion to review the numerous and somewhat conflicting cases upon this subject, to be found in the English and American hooks. It is sufficient for us that the question has been put at rest by the court of last resort. In the case of Elliott v. Swartwout, (10 Peters, 137; 12 Curtis, 46,) the very point is made and decided: “A voluntary payment to a collector, under a mistake of law, cannot be recovered hack.” The English cases are reviewed in the opinion delivered by Mr. Justice Thompson, and the principle clearly announced and settled. That judgment has been followed for more than a quarter of a century, and, so far as we know, has not been seriously questioned. (See also Hunt v. Rousmaniere, 1 Peters, 1.) The same doctrine was held by the Circuit Court of the United States for the eastern district of Pennsylvania, in 1843. ( United States v. Clement and Newman, Crabbe’s Rep., 499; Carey v. Curtis, 3 How., 236.)
Much stress has been laid in the argument upon the cases of Sturges, Bennett & Co.; H. &F. W. Meyer; Spence, Reid & Co.; and several other cases decided some years ago in this court. In those cases, the want of a protest was held not to interpose any obstacle to a recovery in this court. And the payments were held not to be voluntary, because made to public officers, and because they were made upon a mistake or misconception of the law, and not in ignorance of its provisions. We have given to those cases the most careful examination and consideration, but have been unable to coincide with their conclusions. We think the construction there given to the act of 26th February, 1845, is not sustained, either by its terms, the purposes of its enactment, or by the decisions of the courts; and that on the question of the payments being voluntary or otherwise, we regard those decisions as being in direct conflict with the law as laid down by the Supreme Court of the United States. At the time those decisions were made, the court consisted of but three judges, one of whom dissented. In the conclusion here reached the whole five judges agree; so that, of the eight judges who have sat in this court, six of them coincide in the result of this case.
We are, therefore, of opinion that this suit cannot be sustained—
1st. Because there was no protest as required by the act of 26th February, 1845.
Mr. M. V. B. Wilcoxson for the claimants.
Mr. John D. McPherson, Assistant Solicitor, for the government.
2d. Because the payment was made and received under a mutual mistake, and was therefore a voluntary payment, and, as such, irrecoverable.
And for these reasons we sustain the demurrer, and dismiss the petition.

Note. — The doctrine held by this court, under its former organization, in Sturges, Bennett & Co.'s case, conflicts with the law as laid down bv the Supreme Court.
This case establishes a principle on which the former Court of Claims always stood divided. In the case of Sturges, Bennett & Co., the court first considered the subject on the motion to take evidence, and stood divided. When the same case came up for final hearing, it was again considered by the court, which again stood divided. Judge Blackford persistently dissented in a large number of cases where the same principle was involved, until, in David Wood's case, the question was again considered, and the court was again divided. On account of the learning contained in those cases, and of the interesting character of the questions discussed, these cases are inserted here. The following are the chief questions considered:
Is a party who, on the re-delivery to him of warehoused goods, pays, without protest, duties not imposed by law, but which are exacted by the collector, entitled to relief ?
Can money paid with a knowledge of all the facts, but under a mutual mistake of law, both parties meaning to conform to the law, but acting under a misconstruction, which was ascertained by subsequent decision of the Supreme Court, be recovered back ?
Is there not a clear and well-settled distinction between ignorance and mistakes of law ?
Was not this money also paid’ under a moral duress ? For, from the time of Astley v. Reynolds, Str.,) down to Steele v. Williams, (20 Eng. Law and Eq.,) the authorities have been uniform such a payment is involuntary and that the money may be recovered back?