ROPES (BEARSE v.). See Case No. 1,192.

## Case No. 12,041.

### ROPES et al. v. CLINCH.

[8 Blatchf. 304;[1] 13 Int. Rev. Rec. 124, 132.]

Circuit Court, S. D. New York. April Term, 1871.

CUSTOMS DUTIES—LAWS IN CONFLICT WITH TREATIES—OPERATIVE EFFECT OF TREATY—RUSSIAN HEMP.

1. Congress may pass any law, otherwise constitutional, notwithstanding it conflicts with an existing treaty with a foreign nation.
[Cited in Edye v. Robertson, 112 U. S. 598. 5 Sup. Ct. 253; Bartram v. Robertson, 15 Fed. 214.]

2. If an act of congress is plainly in such conflict, a court cannot inquire whether, in passing such act, congress had or had not an intention to pass a law inconsistent with the provisions of the treaty.

3. Modes specified in which congress may destroy the operative effect of a treaty.
[Cited in Castro v. De Uriarte, 16 Fed. 97; North German Lloyd S. S. Co. v. Hedden, 43 Fed. 22.]

4. It being provided by article 6 of the treaty between the United States and Russia, of December 6th–18th, 1832 (8 Stat. 446), that no higher duties shall be imposed on the importation into the United States, of any article, the produce or manufacture of Russia, than are or shall be payable on the like article, being the produce or manufacture of any other foreign country, and congress having, by section 1 of the act of August 5. 1861 (12 Stat. 292), imposed a duty on unmanufactured Russia hemp of forty dollars per ton, and on Manilla and other hemps of India of twenty-five dollars per ton, such legislation is a declaration by congress that such provision of the treaty shall no longer operate as the law of the land in respect to the duty on unmanufactured Russia hemp.

5. Duties charged on Russia hemp, at forty dollars per ton, in accordance with said act of 1861. cannot be recovered back, although the act was inconsistent with the previous treaty.

This was an action [by William Ropes and others] against [Charles P. Clinch] the collector of the port of New York to recover back duties paid under protest on unmanufactured Russia hemp. The duties were exacted under the provisions of section 1 of the act of August 5, 1861 (12 Stat. 292), which imposed the following duties: "on unmanufactured Russia hemp, forty dollars per ton: on Manilla and other hemps of India, twenty-five dollars per ton." The duty exacted was at the rate of forty dollars per ton. The plaintiffs contended that, under the provisions of article 6 of the treaty between the United States and Russia, of December 6–18, 1832 (8 Stat. 446), the rate of duty should have been the same as on hemps of India, namely, twenty-five dollars per ton. Article 6 of the said treaty was as follows: "No higher or other duties shall be imposed on the importation into the United States, of any article, the produce or manufacture of Russia, and no higher or other duties shall be imposed on the importation into the empire of Russia, of any article, the produce or manufacture of the United States, than are, or shall be, payable on the like article, being the produce or manufacture of any other foreign country. Nor shall any prohibition be imposed on the importation or exportation of any article, the produce or manufacture of the United States or of Russia, to or from the ports of the United States, or to or from the ports of the Russian empire, which shall not equally extend to all other nations." At the close of the trial, which was before the court and a jury, the counsel for the defendant moved the court to instruct the jury to find a verdict for the defendant.

George T. Curtis and Andrew R. Culver, for plaintiffs.

Noah Davis, Dist. Atty., for defendant.

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

WOODRUFF, Circuit Judge (orally). It would have been a satisfaction to me, had the counsel deemed it consistent with their sense of duty to allow this case to go to the jury upon the questions of fact involved in the issue, if, indeed, there be a question of fact which is in dispute, or about which there is any conflict of evidence, and to reserve the legal questions for consideration in the supreme court, only calling upon me to rule, for the time being, in such manner as would enable the verdict of the jury to be sent up with the record, and so that the decision in that court might, in one aspect of the case, be final, and, perhaps, in any aspect of the case, save the expense of further litigation. It has, however, been my practice, when called upon, to decide questions as they arise, and, in general, I have deemed it a matter of right in parties, to call upon the judge, even at a nisi prius trial, (unless some public interest forbids,) to express an opinion and decide according to the convictions which rest upon his mind after the case is developed, and counsel have had a full opportunity to be heard. When that has been claimed of me, I have not been in the habit, through any pride of opinion or feeling of apprehension lest the conclusion at which I arrived here should be reversed by another and higher tribunal, of withholding the opinion, or the decision to which it leads.

In view of the circumstance suggested by counsel, that two cases involving the same principal question, at least, heretofore arose at or about the same time, one in this circuit and another in the First circuit, and that the judge in this circuit (Curtis' Adm'x v. Fiedler, 2 Black [67 U. S.] 461) ruled in accordance with the claims now made by the plaintiffs, and the judge in the First circuit (Taylor v. Morton [Case No. 13,799]) ruled in accordance with the claims of the defendant, the question has been asked, which case I deem it my duty to follow. Judging from the information disclosed by the reports of these cases, and giving some heed, as I think I ought, to what has been produced here as a correspondence among the counsel in relation to the case in this circuit, it seems to me quite manifest, that one case was decided upon a full hearing and upon deliberate consideration, the decision being enforced by the reasons which appear in the published report of the case; while the other was a decision made with a view to further the design of the parties to take the case to the supreme court of the United States. Looking at the two cases with a view to the question which I ought to regard as the higher authority—the respective judges occupying the same relative official positions—I am bound to say, that, as a mere question of authority, the decision in the First circuit ought, under such circumstances, to be regarded as entitled to more influence; and yet that preponderance of mere authority is not such as would induce me, on this occasion, to decide otherwise than according to the conviction which rests in my mind. I answer the question propounded, therefore, by saying, that this court will, on this occasion, follow those convictions. Whether they are sound or not will be hereafter determined by a tribunal whose decision will unquestionably be right on this, as it is to be hoped they will be and are on all other questions.

The question for me to determine is simply—What was the law of the United States when the duties which these plaintiffs seek to recover from the collector were paid by them? When I say that is the simple question, I do not forget that a point has been made in relation to the sufficiency of the plaintiffs' protest. I may concede that that is a question fairly open to discussion; and it may be that the views expressed by the supreme court in the case cited from 2 Black [67 U. S.] 461 (Curtis' Adm'x v. Fiedler), create doubt, but, entertaining the view that I do upon the other branch of the case, I do not deem it necessary to decide that question, or to state what my own conclusion is, or what it would be if I were under the necessity of disposing of the case upon that point.

I shall state very briefly, no doubt imperfectly, and it may be superficially, but yet according to the views which I entertain, the grounds upon which I feel constrained to hold that this action cannot be maintained, and I recur to the question I have stated, namely—what was the law when these duties were collected?

By express, unequivocal, and in no sort doubtful or uncertain terms, the congress of the United States, by the act of 1861, declared that the duty upon Russia hemp imported to this country should be forty dollars per ton. When a statute is brought before the court for consideration there arise, ordinarily, two questions: first—what is the import of the statute? and, second—what is its legal force and effect? As to the import of the statute in this case, I do not understand that the counsel insist that it is open to any doubt. It is not claimed that the words of the act can be construed otherwise than they were construed by the collector of this port when he exacted this duty. They mean just this—that the party importing Russia hemp to this country shall pay forty dollars per ton, as duty thereon to the United States. Now, if the language were doubtful, if it were possible to give it another meaning, more conclusive force would be due to the arguments which have been urged upon this occasion, for the purpose of inducing the court to say that the statute did not repeal the treaty. In such case, it would be the duty of the court to look at the treaty, and, if it be possible to find an interpretation of the statute which will involve no infraction of the treaty, no violation of the pledged faith of the government of the Unit-

ed States to the government of another country, to give it that interpretation, and without hesitation. That, however, is not this case. There is no doubt of the import of the language of this statute, and no room for construction; and, further, the statute can mean nothing else. It is not a question of doubtful interpretation; its language cannot be modified by a qualification; if it could, it might be my duty to qualify it.

The inquiry, therefore, and the only inquiry, remains to the court—what is the force and legal effect of legislation in these terms? "Russia hemp imported to this country shall pay a duty of forty dollars per ton." Such legislation, of course, either is or is not inconsistent with the treaty which this government made with Russia. If it is not inconsistent with it, then, of course, no question would arise here. The statute would be, in every view of the subject, a valid law, and the duty must be adjudged rightly collected. But, if it be inconsistent, (and that must be the ground upon which the plaintiffs proceed here), then we are led into this inquiry—is the force and effect of an act of legislation, distinct and unqualified in its terms, and plain in its meaning, valid, if it be found that it violates or is inconsistent with a prior treaty of the United States with a foreign nation?

On a former occasion, I had the pleasure of listening to an argument, that that provision of the constitution (article 6, § 2) which declares that the constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, operated to give a supremacy to a treaty, and that congress could not, by an act of legislation, make a valid enactment inconsistent with such treaty. That proposition is not insisted upon on this occasion. I understand it to be conceded, and, if it be not, I should be constrained to hold, that the legislative department of this government may pass any law it pleases, (if it is otherwise constitutional,) notwithstanding it conflicts, and notwithstanding to whatever degree, greater or less, it conflicts, with an existing treaty with a foreign nation. Such legislation is not to be imputed to the government upon any doubtful ground. Every presumption is to be indulged against such legislation, but I speak now of the question of power—that it is in the power of the legislative department of this government to enact such laws as they please, (otherwise consistent with the constitution itself,) and give to those laws efficiency and force.

Our system of government divides itself into three departments—executive, legislative, and judicial—and the supreme power of legislation, subject only to the constitution, is vested in the legislature. They legislate, and thereby affect all rights and privileges, and impose all restrictions and obligations upon our own citizens, and upon the citizens of other nations who come within the influence of our laws, subject to the responsibilities of this government, in its national character, for any breach of its faith with foreign nations; and that legislation is binding upon the judicial tribunals, and must be respected and enforced by them. If, then, congress by legislation inconsistent with a treaty, creates a rule of conduct for its citizens, a rule for the guidance of its courts, the only question is—has it enacted a law which operates to annul, or operates in disregard of, the provisions of a treaty? As I before observed, if this act does neither, then there is no question here. If it does either or both, then it seems to me within the constitutional power of congress, and to be binding and conclusive.

To avoid this view of the subject, the suggestion is, that the court should not hold the treaty affected by the legislation, if satisfied, by means of which the court can judicially take notice, that such was not the intention of congress—if satisfied that congress, when they passed this statute, did it without having the treaty under actual consideration, and had no intention to violate its provisions, entertaining, so far as the subject was, in any technical sense even, before them, the purpose to maintain the treaty in its full vigor. The court is thus called upon to say, in this case, nothing less, than that the law in question was wholly inoperative: for, there is nothing in the act imposing any duty upon Russia hemp, except the clause which declares that it shall be charged with a duty of forty dollars per ton. In a word, it unequivocally declares that the duty on Russia hemp shall be forty dollars, and, if it be not liable to that, it is liable to no duty. If the court can inquire into the intention of the legislature, and be so brought to reach the conclusion that, while they passed that act, they nevertheless intended to preserve the treaty with Russia—in fact, that they intended that the duty on Russia hemp should not be greater than upon that of any other country—then the act of congress becomes a nullity. For, if the words "forty dollars" be struck out of the enactment, nothing remains imposing any duty on Russia hemp. I am, therefore, as it seems to me, called upon to declare, that the legislation which has been had was entirely inoperative, because congress did not intend to pass a law which should be inconsistent with the terms of the treaty. In other words, although congress has passed an act in explicit terms, of no doubtful meaning, susceptible of but one interpretation, this court is at liberty to declare that such law has no effect, and to refuse to regard it, because convinced that congress did not intend that it should have the effect which necessarily follows from enforcing it. It is not within the scope of judicial inquiry to ask, in such a case, what

was the intention of congress, for any such purpose; and the court cannot be influenced by any such convictions.

There are three modes in which congress may practically yet efficiently annul or destroy the operative effect of any treaty with a foreign country. They may do it by giving the notice which the treaty contemplates shall be given before it shall be abrogated, in cases in which, like the present, such a notice was provided for; or, if the terms of the treaty require no such notice, they may do it by the formal abrogation of the treaty at once, by express terms; and even where, as in this case, there is a provision for the notice, I think the government of the United States may disregard even that, and declare that "the treaty shall be, from and after this date, at an end," and meet the consequences of their responsibility for a breach of faith with the Russian government. And yet, while I state that as my judgment of the legal proposition, I am not thereby intimating that it is a thing proper to be done, or that such a proposition can be presumed to be entertained by our government, or, if at all, except upon exigencies and under the pressure of considerations of state, of such importance and necessity as compels a departure from good faith. But, as a legal proposition, I suppose it is possible in that way to destroy the legal operation of a treaty. So, they may render it inoperative by legislation in contradiction of its terms, without formal allusion at all to the treaty; and, generally, they may legislate as if no such treaty existed, in modification or alteration of what, by force of the treaty, has been the law heretofore, thus modifying the law of the land, without denying the existence of the treaty, or the obligations thereof between the two governments, as a contract, and answer therefor to such foreign government, or meet its reclamation or retaliation as may be necessary.

I have already said, that, if this act of 1861 is to have any force at all, and is not to be pronounced by me a nullity, then, (upon the assumption upon which alone this action is based, that the imposition of forty dollars a ton is in violation of the treaty,) congress has done that which, pro tanto, amounts to a refusal to be bound by its provisions, and a declaration that it shall no longer operate as the law of the land. I am ready to confess, however much I ought to regret it, that I cannot appreciate the suggestion, that, conceding that congress has the constitutional power to pass an act inconsistent with, and, therefore, in effect, repealing a provision in a treaty, and that, if passed with that intent, such act will have that operation and be valid and binding according to its terms, it is, nevertheless, competent for the judicial tribunals to inquire, in this case, whether the enactment which imposed a duty of forty dollars per ton upon Russia hemp was intended to repeal the stipulation in the treaty, which, in effect, declares that the duty on Russia hemp shall not be more than twenty-five dollars; and that is what I am called upon by the argument to do, when it is practically applied to the case in hand. I am called upon to say, that an act of congress imposing a duty of forty dollars per ton on Russia hemp, was not intended to affect a treaty which, when applied to hemp, amounts to an enactment, or a law, that the duty shall not exceed twenty-five dollars. Such power to go behind the terms of an enactment, and inquire whether congress intended that it should have the effect necessarily produced by its due execution, I am compelled to disclaim. I am not at liberty to say that the acts of the legislative department of the government were not intended to operate according to their plain import, or were carelessly or inadvertently promulgated. If I could do so in one case, it is difficult to see why I could not in another; and the judicial tribunals would be occupied, not merely with the inquiry what is the import of a statute, but with the question whether congress passed it upon due consideration, and with intent that it should have its necessary effect.

Subsequent legislation changing the duty is claimed to indicate that there was no intention to violate the treaty, and that the act imposing the duty of forty dollars was inadvertently passed, and that this may properly influence the court to disregard the act. It was entirely competent for congress to subsequently review the history of their legislation. It was competent for them to come to the conclusion that there had been imperfect legislation, careless legislation, inadvertent legislation, and that, through that carelessness and inadvertence, a law had been passed, which, if carried into execution, would violate a treaty, and, on a review of the subject, to conclude that it was wise, that it was due to the government of Russia, or best on any grounds, to conform the law to the treaty, as has since been done. Act July 14, 1870 (16 Stat. 264). But it is quite beyond the sphere of my investigation to inquire what the reasons were that induced congress to change the law. In one aspect, the very fact of the later legislation to harmonize the law with the treaty is an indication of their judgment, that, as the law stood, the treaty was violated, and was violated by a law that was operative and binding, and that, because it was operative and binding upon citizens, public officers and the courts, it ought to be changed by further legislation. In that view, there is nothing for the court to say, founded on the suggestion that, although the act of 1861 was passed, there was no intent to violate the treaty, and, therefore, it is not violated. I repeat, that it is not for the court to inquire whether it was because congress deemed it wise, upon one ground or another, to change the law, that this subsequent legislation has taken place; and yet, if I were to draw any conclu-

sion or inference from the fact of a change, the inference would be that the change was necessary, and that, if the change was necessary, it was because the law was in such a condition that Russia had a right to complain of it.

These views—without enlarging further, and, perhaps I have said much more than it was necessary to say—these views necessarily result in a conviction, that I am bound by the act which congress passed, and that I am not at liberty, either for the purpose of determining its influence upon the treaty, or for any other purpose, its terms being clear, to inquire whether congress passed it intentionally or unintentionally, not even although there were a subsequent express declaration by congress that it was unintentional. The necessary result is, that a direction should be given to find a verdict for the defendant, and the jury are so directed.

The jury found a verdict for the defendant.