NORTH GERMAN LLOYD S. S. Co. *v.* HEDDEN, Collector.

SAME *v.* MAGONE, Collector.

*(Circuit Court, D. New Jersey.* May 21, 1890.)

1. CUSTOMS DUTIES—CONSTRUCTION OF LAWS—TONNAGE TAX.
    Act Cong. June 26, 1884, § 14, which levies a duty of 3 cents per ton on all vessels "from any foreign port or place in North America, Central America, the West India islands, the Bahama islands, the Bermuda islands, or the Sandwich islands, or Newfoundland," and a duty of 6 cents per ton on vessels from other foreign ports, does not entitle German vessels sailing from European ports to enter our ports on payment of a duty of 3 cents per ton, under the treaties of December 20, 1827, and May 1, 1828, which stipulate that the United States shall not grant any particular favor regarding commerce or navigation to any other foreign nation which shall not immediately become common to Germany, since the discrimination contained in said act is merely geographical, and the 3-cent rate applies to vessels of all nations coming from the privileged ports.

2. TREATIES—EFFECT OF INCONSISTENT ACT OF CONGRESS.
    Where an act of congress is in conflict with a prior treaty the act must control, since it is of equal force with the treaty and of later date.

3. CONSTITUTIONAL LAW—COMMISSIONER OF NAVIGATION.
    Act Cong. July 5, 1884, § 3, which makes final the decision of the commissioner of navigation on all questions "relating to the collection of tonnage tax, and to the refunding of such tax, when collected erroneously or illegally," is constitutional.

At Law.
*Samuel F. Bigelow* and *Henry C. Nevitt,* for plaintiff.
*Howard W. Hayes,* Asst. U. S. Dist. Atty., for defendants.

WALES, J. The plaintiff, a duly-organized corporation under the laws of the Hanseatic republic of Bremen, which is a part of the German empire, is the owner of a line of ocean steam-ships, plying regularly between the ports of Bremen and New York, and brings these actions, under section 2931, Rev. St. U. S., to recover the amount of certain tonnage dues, alleged to have been unlawfully collected from said ships during the period extending from June 26, 1884, to July 28, 1888, and while the defendants were successively collectors of customs at the last-named port. The vessels cleared from Bremen for New York via Southampton, Eng., stopping at or near the latter place temporarily, to discharge cargo and passengers, and to take on board additional cargo, passengers, and mails. The consignees of the vessels paid the dues, in every instance, under protest, and the plaintiff appealed to the secretary of the treasury, and finally, at the suggestion of the latter officer and with the concurrence of the department of justice, brought these actions to determine the authority of the defendants.

v.43F.no.1—2

The right of the plaintiff to recover depends upon the following statement of the law and facts: Prior to the act of congress of June 26, 1884, entitled "An act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade," tonnage tax was imposed upon German and all other vessels arriving in the United States from foreign ports, at the rate of 30 cents per ton per annum, and up to July 1st, of that year, it had been collected in a lump sum for a year at a time. But section 14 of the act of 1884 changed the rate and mode of collection as follows:

"That in lieu of the tax on tonnage of thirty cents per ton per annum, heretofore imposed by law, a duty of three cents per ton, not to exceed in the aggregate fifteen cents per ton in any one year, is hereby imposed at each entry on all vessels which shall be entered in any port of the United States from any foreign port or place in North America, Central America, the West India islands, the Bahama islands, the Bermuda islands, or the Sandwich islands, or Newfoundland; and a duty of six cents per ton, not to exceed thirty cents per ton per annum, is hereby imposed at each entry upon all vessels which shall be entered in the United States from any other foreign ports." 23 U. S. St. 57.

This section was amended by section 11 of the act of congress of June 19, 1886, entitled "An act to abolish certain fees," etc. 24 U. S. St. 81. The amendment consisted in adding the following words to those just quoted:

"Not, however, to include vessels in distress or not engaged in trade: provided, that the president of the United States shall suspend the collection of so much of the duty herein imposed on vessels entered from any foreign port as may be in excess of the tonnage and light-house dues, or other equivalent tax or taxes, imposed in said port on American vessels, by the government of the foreign country in which such port is situated, and shall, upon the passage of this act, and from time to time thereafter as often as it may become necessary, by reason of changes in the laws of the foreign countries above mentioned, indicate by proclamation the ports to which such suspension shall apply, and the rate or rates of tonnage duty, if any, to be collected under such suspension: provided, further, that such proclamation shall exclude from the benefits of the suspension herein authorized, the vessels of any foreign country in whose ports the fees or dues of any kind or nature imposed on vessels of the United States, or the import or export duties on their cargoes, are in excess of the fees, dues, or duties imposed on the vessels of the country in which such port is situated, or on the cargoes of such vessels; and sections 4223 and 4224 and so much of section 4219 of the Revised Statutes as conflict with this section are hereby repealed."

Section 4219, tit. 48, c. 3, Rev. St., referred to in the foregoing subproviso, provides that "nothing in this section shall be deemed * * * to impair any rights * * * under the law and treaties of the United States relative to the duty of tonnage on vessels." Section 4227 of the same title and chapter is in these words:

"Nothing contained in this title shall be deemed in any wise to impair any rights and privileges which have been or may be acquired by any foreign nation under the laws and treaties of the United States, relative to the duty on tonnage of vessels, or any other duty on vessels."

By article 9 of the treaty of December 20, 1827, between the United States and the Hanseatic republics, "the contracting parties * * * engage mutually not to grant any particular favor to other nations, in respect of commerce and navigation, which shall not immediately become common to the other party." Public Treaties, 400. Article 9 of the Prussian-American treaty of May 1, 1828, (Pub. Treaties, 656,) contains a like stipulation. These treaties have been held by both the American and German governments to be valid for all Germany. On the 26th of January, 1888, the president, in virtue of the authority vested in him by section 11 of the act of June 19, 1886, issued his proclamation, wherein, after reciting that he had received satisfactory proof that no tonnage or light-house dues, or any equivalent tax or taxes whatever, are imposed upon American vessels entering the ports of the German empire, either by the imperial government or by the governments of the German maritime states, and that vessels belonging to the United states are not required, in German ports, to pay any fee or due of any kind or nature, or any import duty higher or other than is payable by German vessels or their cargoes, did "declare and proclaim that from and after the date of this my proclamation shall be suspended the collection of the whole of the duty of six cents per ton * * * upon vessels entered in the ports of the United States from any of the ports of the empire of Germany, * * * and the suspension hereby declared and proclaimed shall continue so long as the reciprocal exemption of vessels belonging to citizens of the United States and their cargoes shall be continued in the said ports of the empire of Germany, and no longer." The commissioner of navigation, in his circular letter No. 19, dated February 1, 1888, and approved by the secretary of the treasury, addressed to the collectors of customs and others, decided that the president's proclamation does not apply to vessels which entered before the date of the proclamation, and that only those German vessels "arriving directly from the ports of the German empire may be admitted under the proclamation without the payment of the dues therein mentioned." The commissioner of navigation claims authority to make this decision by virtue of section 3 of the act of congress of July 5, 1884, entitled "An act to constitute a bureau of navigation in the treasury department," which reads as follows:

"That the commissioner of navigation shall be charged with the supervision of the laws relating to the admeasurement of vessels, and the assigning of signal letters thereto, and of designating their official number; and on all questions of interpretation, growing out of the execution of the laws relating to these subjects, and relating to the collection of tonnage tax, and to the refunding of such tax when collected erroneously or illegally, his decision shall be final."

The plaintiff's vessels were German vessels, and on the 19th day of June, 1886, and thereafter until now, the government of Germany exacted no tonnage tax or taxes whatever on vessels of the United States arriving in German ports.

Upon this statement of the law and the facts, the plaintiff's counsel contend (1) that as to the dues collected between June 26, 1884, and June 19, 1886, the plaintiff's vessels should not have been charged more than the lower rate of tonnage tax fixed by the act of 1884, under the favored nation clause of the treaties, whereas the defendants charged six cents per ton; (2) that the dues collected after the passage of the act of June 19, 1886, and prior to the president's proclamation, were excessive, for the same reason; (3) that no tonnage tax whatever could be lawfully collected of the vessels of the plaintiff, after the passage of the act of June 19, 1886, because that act went into effect immediately, and without waiting for the president's proclamation; (4) that the act of July 5, 1884, in so far as it confers on the commissioner of navigation the power of deciding finally on all questions of interpretation, growing out of the execution of the laws relating to the collection of tonnage tax, and the refund of the same when illegally or erroneously collected, is unconstitutional and void.

As introductory to their argument, plaintiff's counsel referred to the policy of our government in relation to the subject of navigation, which, it is claimed, has been from the beginning to establish entire reciprocity with other nations. The practice has been to ask for no exclusive privileges and to grant none, "but to offer to all nations and to ask from them entire reciprocity in navigation." 1 Kent, Comm. 34, note. This policy has been judicially recognized by the supreme court in *Oldfield* v. *Marriott*, 10 How. 146; and it is asserted that congress had it in view in enacting the acts of 1884 and 1886, imposing the tonnage taxes. The review presented by counsel of the legislative and diplomatic correspondence touching this subject is historically interesting and instructive, and would be persuasive in the case of a doubtful meaning of an act of congress, but it cannot be held to affect the interpretation of laws which are plain and unambiguous in their terms. The questions before the court must be determined by the ordinary and well-settled rules applicable to the construction of and validity of statutes.

Soon after the passage of the act of June 26, 1884, claims were presented by the government of Germany, and of other foreign powers, having similar treaty stipulations with the United States, in relation to navigation for the benefit of the three-cent rate of tax, under the favored-nation clause. The claims having been referred to the department of justice, the attorney general, on the 19th of September, 1886, gave the following opinion:

"The discrimination as to tonnage duty in favor of vessels sailing from the regions mentioned in the act, and entered in our ports, is, I think, purely geographical in character, inuring to the advantage of any vessel of any power that may choose to fetch and carry between this country and any port embraced by the fourteenth section of the act. I see no warrant, therefore, to claim that there is anything in the most 'favored-nation clause' of the treaty between this country and the powers mentioned that entitles them to have the privileges of the fourteenth section extended to their vessels sailing to this country from ports outside of the limitations of the act."

The construction thus given to the statute is clearly consistent with its terms, which grant the privilege of the minimum tax to all vessels entered in United States from certain specified foreign ports, and not exclusively to the vessels of nations to whom those ports belong, or in whose territories the ports are situate, excepting the vessels of those governments only which, in the imposition of tonnage taxes, discriminate against American vessels. In accordance with this construction, it follows that no particular favor is conferred on any nation, and that, with the exception noted, the vessels of all nations coming from the privileged ports are entered in the United States on an equal footing. Further discussion on this point would seem, therefore, to be fruitless; but it may be proper to observe that the construction of both the act of June 26, 1884, and of that of June 19, 1886, and the complicated questions growing out of the claims of foreign governments, for the lower rate of tonnage tax by virtue of their treaty rights, were brought to the attention of congress by the president's message of January 14, 1889, transmitting a report of the secretary of state in reference to the international questions arising from the imposition of differential tonnage dues upon vessels entering the United States from foreign countries. Ex. Doc. House Rep., 50th Cong., 3d Sess. The report, after mentioning the claims of the German minister for a reduction of the tax under the act of 1884, and for a proper refund of the dues charged on German ships entering the United States from German ports since the date of the act of 1886, stated: "To this suggestion the undersigned was unable to respond, the matter being one for the consideration of congress. But the request assuredly deserves equitable consideration." In respect to the claim now made by the plaintiff, that the course of its ships coming from Bremen to New York by the way of Southampton is not such as to deprive the run of its character of a voyage from a German port to a port in the United States, within the meaning of the act of 1886, the report says:

"But it has been held by the commissioner of navigation that the voyage cannot be so regarded, and that the vessels must pay dues as coming from Southampton, a British port. Similar rulings have been made in respect to other vessels of different nationality."

And the report further adds:

"Another instance of complication is that of a vessel starting from, we will say, a 6-30 cent port, and calling on her way to the United States at a 3-15 cent port, and a free port. Other combinations will readily suggest themselves, and need not be stated. But in each case the vessel is required to pay the highest rate, without reference to the amount of cargo obtained at the various ports from which she comes. Thus a penalty may practically be imposed in many cases on indirect voyages. It is conceived that in many instances the main purpose of the act may be defeated by these rulings, but it must be admitted that the law contains no provision to meet such cases. * * * This appears to be a proper subject for the consideration of congress."

From an examination of the above extracts from his report, it will be seen that the secretary of state was of the opinion that the questions re-

ferred to were to be addressed to the political, and not to the judicial, branch of the government, and that congress alone could be looked to for the redress of the class of wrongs complained of by the plaintiff, and to prevent their repetition. The plaintiff's counsel deny the correctness of the construction given to the act of 1884 by the attorney general, and insist that the difference in tonnage rates, by which certain ports specially named in the act are favored, is a particular favor to the countries to which those ports belong, "in respect to their commerce and navigation" which *ipso facto* accrues, in pursuance of treaty rights, to German vessels coming from German ports. It is also asserted that the treaty stipulations with Germany are paramount to the later acts of congress, and that the former cannot be annihilated by the latter. Admitting for the moment that the attorney general may have misconstrued the act, still it cannot be questioned that, excepting where rights have become vested under a treaty, to use the expression of Judge SWAYNE, in the *Cherokee Tobacco Case*, 11 Wall. 616, "a treaty may supersede a prior act of congress, and an act of congress may supersede a prior treaty." The commissioner of navigation held that the acts of 1884 and 1886 were inconsistent with the treaties, and being of a later date must prevail, and in so ruling he is not without authority of adjudged cases. In *Foster* v. *Neilson*, 2 Pet. 314, Chief Justice MARSHALL, in delivering the opinion of the court, said:

"Our constitution declares a treaty to be a law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engage to perform a particular act, the treaty addresses itself to the political, not the judicial, department and the legislature must execute the contract before it can become a rule for the court."

The same doctrine is held in *Taylor* v. *Morton*, 2 Curt. 454; *Ropes* v. *Clinch*, 8 Blatchf. 304. In the *Cherokee Tobacco Case, supra*, there was an open conflict between a treaty contract and a subsequent law, and the question was as to which should prevail. The 107th section of the internal revenue act of July 20, 1868, provided "that the internal revenue laws imposing taxes on distilled spirits, fermented liquors, tobacco, snuff, and cigars shall be construed to extend to such articles produced anywhere within the exterior boundaries of the United States, whether the same be within a collection district or not." The tenth article of the treaty of 1866 between the United States and the Cherokee Nation of Indians stipulated as follows:

"Every Cherokee Indian and freed person residing in the Cherokee Nation shall have the right to sell any products of his farm, including his or her live-stock, or any merchandise or manufactured products, and to ship and drive the same to market without restraint, paying the tax thereon which is now or may be levied by the United States on the quantity sold outside of the Indian Territory."

The collection officers had seized a quantity of tobacco belonging to the claimants which was found in the Cherokee Nation, outside of any collection district of the United States, and exemption from duty was

claimed by virtue of the treaty. It was admitted that the repugnancy between the treaty and the statute was clear, and that they could not stand together; that one or the other must yield. The court decided that the language of the section was as clear and explicit as could be employed. It embraced indisputably the Indian Territory, and congress not having thought proper to exclude them, it was not for the court to make the exception; and that the consequences arising from the repeal of the treaty were matters for legislative and not judicial action, and if a wrong had been done, the power of redress was with congress and not with the judiciary. In *Taylor* v. *Morton*, the facts were these: Article 6 of the treaty of 1832, with Russia, stipulated that "no higher or other duties shall be imposed upon the importations into the United States of any article the produce or manufacture of Russia, than are or shall be payable on the like article being the produce or manufacture of any other foreign country." This was held by the court to be merely an agreement, to be carried into effect by congress, and not to be enforced by the court, and that an act of congress laying a duty of $25 a ton, on hemp from India, and $40 a ton, on hemp from other countries, did not authorize the courts to decide that Russian hemp should be admitted at the lower rate. Such a promise, it was said, addresses itself to the political and not to the judicial department of the government, and the courts cannot try the question whether it has been observed or not. The court expressly declined to give any opinion on the merits of the case, holding that the questions, whether treaty obligations have been kept or not, and whether treaty promises shall be withdrawn or performed, are matters that belong to diplomacy and legislation, and not to the administration of the laws. If congress has departed from the treaty, it is immaterial to inquire whether the departure was accidental or designed, and if the latter whether the reasons therefor were good or bad. If, by the act in question, they have not departed from the treaty, the plaintiff has no case. If they have, their act is the municipal law of the country, and any complaint, either by the citizen or the foreigner, must be made to those who alone are empowered by the constitution to judge of its grounds and act as may be suitable and just.

As to the time when the act of June 19, 1886, went into operation, whether immediately from and after the date of its approval, or not until the date of the president's proclamation, and also whether the voyages of the plaintiff's vessels from Bremen to New York must be made "directly," and without stoppage at an intermediate port, in order to be exempted from the imposition and payment of tonnage dues, the decision of these questions by the commissioner of navigation must be held to be conclusive, unless so much of section 3 of the act of July 5, 1884, which makes his decision final in such matters, is unconstitutional. Much learning and ability have been employed by plaintiff's counsel to establish the invalidity of this portion of the act, which invests a department officer with such unlimited judicial power, and by which he is enabled to decide all contests in relation to alleged illegal dues, *ex parte*, and absolutely. On the other hand, the labor and responsibility of the court

have been increased by the omission of the defendant's counsel to furnish any assistance towards the solution of the questions, and permitting them to pass *sub silentio.* The subject, however, is not *res integra.* In *Cary* v. *Curtis,* 3 How. 236, the supreme court had under consideration the constitutionality of the third section of the act of congress of March 3, 1839, entitled "An act making appropriations for the civil and diplomatic expenses of the government for the year 1839," by which the secretary of the treasury was authorized to finally decide when more duties had been paid to any collector of customs, or to any person acting as such, than the law required, and to draw his warrant in favor of the person or persons entitled for a refund of the amounts so overpaid. The opinion of the court discusses very ably and at much length the questions involved in that case. A few sentences taken from the opinion will indicate the grounds upon which the validity of the act of 1839 was sustained:

"We have no doubts [say the court] of the objects or the import of that act. We cannot doubt that it constitutes the secretary of the treasury the source whence instructions are to flow; that it controls both the position and the conduct of the collectors of the revenue; that it has denied to them any right or authority to retain any portion of the revenue for purposes of contestation or indemnity; has ordered and declared those collectors to be the mere organs of receipt and transfer, and has made the head of the treasury department the tribunal for the examination of claims for duties said to have been improperly paid. * * * It is contended, however, that the language and the purposes of congress, if really what we hold them to be declared in the statute of 1839, cannot be sustained, because they would be repugnant to the constitution, inasmuch as they would debar the citizen of his right to resort to the courts of justice. * * * The objection above referred to admits of the most satisfactory refutation. This may be found in the following positions, familiar in this and in most other governments, viz, that the government, as a general rule, claims an exemption from being sued in its own courts. That although, as being charged with the administration of the laws, it will resort to those courts as means of securing this great end, it will not permit itself to be impleaded therein, save in instances forming conceded and express exceptions. Secondly, in the doctrine, so often ruled in this court, that the judicial power of the United States, although it has its origin in the constitution; is (except in enumerated instances, applicable exclusively to this court) dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of congress, who possess the sole power of creating the tribunals (inferior to the supreme court) for the exercise of the judicial power, and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to congress may seem proper for the public good. To deny this position would be to elevate the judicial over the legislative branch of the government, and to give to the former powers limited by its own discretion merely. It follows, then, that the courts created by statute must look to the statute as the warrant for their authority. * * * The courts of the United States are all limited in their nature and constitution, and have not the powers inherent in courts existing by prescription or by the common law. * * * The courts of the United States can take cognizance only of subjects assigned to them expressly or by necessary implication; *a fortiori,* they can take no cognizance of matters that by law are either denied to them, or expressly referred *ad aliud examen.*"

This exposition of the origin and extent of the jurisdiction of the courts of the United States was reaffirmed in *Sheldon* v. *Sill*, 8 How. 449, where it was held that courts created by statute can have no jurisdiction but such as the statute confers. The right given by section 2931, Rev. St., to sue for overpaid dues is taken away by the act of July 5, 1884, and the power to determine controversies arising from alleged exactions by collectors is deposited with the commissioner of navigation. Such is the effect of the decisions just cited, and which, as long as they are not overruled by the tribunal which made them, must be obeyed as the law of the land. The authorities referred to by plaintiff's counsel are cases where department officers, in making regulations to be observed by their subordinates, exceeded their statutory power, but in no one instance was it pretended that the officer was clothed with the power to make a final decision in contested matters. It was perhaps unnecessary, in view of *Cary* v. *Curtis*, and *Sheldon* v. *Sill*, that I should have done more than acquiesce in the doctrines there announced, and support the validity of the act of July 5, 1884, without further discussion, but the large amount of money involved in the present actions, and the earnestness and force with which the plaintiff's claims have been pressed, have induced me to make a more extended presentation of them than was at first designed. It must be borne in mind that this court is not called on to express any opinion on the justice or expediency of placing such unlimited power in the hands of the commissioner of navigation as is conferred by the act of July 5, 1884. The duty of the court is to discover whether the act is in conflict with the constitution, and, on being satisfied that it is not, to judge accordingly. To pursue any other course would be not only extrajudicial, but also improper, in assuming to criticise the wisdom of congress in making the law. Neither is the court required to say whether the commissioner of navigation is or is not correct in his interpretation of the law. Congress has seen fit to constitute him the final arbiter in certain disputes, and congress alone can supply a remedy for any wrong which may have arisen from his construction of the law relating to the collection of tonnage due. Let judgment be entered in each case for the defendant.