**UNION OIL CO. OF CALIFORNIA v.
BRYAN.**

**No. 1749 O'C Civil.**

District Court, S. D. California,
Central Division.

Oct. 14, 1943.

Walter I. Carpeneti, of San Francisco, Cal., for plaintiff.

Charles H. Carr, U. S. Atty., and John M. Gault and James L. Crawford, Asst. U. S. Attys., all of Los Angeles, Cal., for defendant.

J. F. T. O'CONNOR, District Judge.

This is an action to recover tonnage taxes assessed and paid upon the plaintiff's vessel, American tank steamer, Montebello, pursuant to 46 U.S.C.A. § 121.

Three questions are presented to the court for determination: (1) Has this court jurisdiction of a controversy involving the assessment and collection of tonnage taxes? (2) Were the tonnage taxes properly assessed? (3) Can the Collector of Customs be sued to recover a tonnage tax, if such tax is found to be illegally collected?

Under the first contention only two decisions, both written fifty-three years ago (North German Lloyd Steamship Co. v. Hedden, 43 F. 17, May 21, 1890, Circuit Court for the District of New Jersey; and Laidlaw v. Abraham, 43 F. 297, August 18, 1890, Circuit Court for the District of Oregon) have passed upon the question.

The parties have filed extensive and carefully prepared briefs. The final decision of the courts will affect the tonnage tax, and therefore the commerce flowing into our ports. The facts are stipulated. The application of those facts to the law is the court's problem.

The plaintiff, Union Oil Company of California, "now is and at all material times was the owner and operator of the American Tank Steamer Montebello, an ocean-going vessel of 5,107 net tons * * *." On October 23, 1940, the Montebello was loaded with a cargo of crude petroleum, oil fuel and diesel oil at Los Angeles, California, destined for discharge at various ports in Chile, South America. The crew of said vessel signed ship's articles for a voyage to Iquique, Valparaiso, and Antofagasto, Chile, and return to a Pacific Coast United States Port. On various dates after October 23, 1940, when the tank steamer, Montebello, cleared from Port of Los Angeles, its cargo was discharged at the respective ports designated on different dates until it cleared for Antogafasto. Upon completion of discharge at the last named port, the Montebello proceeded in ballast to Talara, Peru, where she loaded a cargo of crude petroleum, and thereupon cleared for Vancouver, British Columbia. Upon arrival in that port, she discharged her entire cargo. The Montebello then proceeded in ballast from Vancouver, B. C., to Port San Luis, California, arriving December 24, 1940. Upon arrival at San Luis, the Master of the vessel tendered to the Deputy Collector of Customs a Master's Oath on form No. 3251, showing the Montebello as arriving from Vancouver, Canada. The Collector refused to accept the Master's Oath and demanded an Oath showing the vessel arrived from Talara, Peru, which was furnished, and then the Collector demanded and collected from plaintiff tonnage duty at the rate of six (6) cents per ton in the total sum of three hundred six and forty-two one-hundredths dollars.

Following the entry of the Montebello, her crew were paid and discharged before a United States Shipping Commissioner. The certificate of registry was surrendered owing to a change of trade from foreign to coastwise operations. On May 7, 1941, the plaintiff applied to the Director of the Bureau of Marine Inspection and Navigation, hereinafter referred to as the Director, for refund of two hundred four and twenty-eight hundredths dollars, representing the difference between the amount of tonnage tax computed at the six (6) per cent rate and the amount computed at two (2) per cent, which the plaintiff deemed applicable. It appeared by affidavit that any party in interest to a matter involving the payment of tonnage taxes may obtain, upon request, an opportunity to appear and be heard either before the Director or one of his qualified assistants. Neither the Customs brokers, who entered vessels, nor the owners of the vessels, were ever advised that an oral hearing could be had. On May 31, 1941, the Director decided that the tonnage tax was correctly assessed upon entry of the Montebello, on December 24, 1940. The application for refund was denied.

The statute provides: "The Commissioner of Navigation shall be charged with the supervision of the laws relating to the admeasurement of vessels, and the assign-

ing of signal letters thereto, and of designating their official number; and on all questions of interpretation growing out of the execution of the laws relating to these subjects, and relating to the collection of tonnage tax, and to the refund of such tax when collected erroneously or illegally, his decision shall be final."

Act July 5, 1884, 23 Stat. 119, 46 U.S.C.A. § 3.

Prior to the enactment of the Act of July 5, 1884, an appeal could be taken to the Secretary of the Treasury for a refund of tonnage tax (Act of June 30, 1864, 13 Stat. 202), and to the Department of State upon the interpretation of treaties involving the collection of said tax. The Act of July 5, 1884, was a reorganization measure. See statement, Representative Dingley, 15 Congressional Record, Part 4. This Act ended administration confusion and made the decision of the Commissioner of Navigation final, thus terminating appeals to the Secretary of the Treasury, the Secretary of State, or any other administrative head. There was no intention on the part of Congress to deprive the courts of jurisdiction.

"By the Act of June 30, 1932, Chapter 314, Section 501 (47 Stat. 415), (5 U.S.C.A. § 597a), the Bureau of Navigation was consolidated with the Steamboat Inspection Service into the Bureau of Navigation and Steamboat Inspection, under the Chief of the new bureau, who succeeded to the duties and powers of the Commissioner of Navigation under the 1884 Act quoted above. (46 U.S.C.A. § 3.) By the Act of May 27, 1936, Chapter 463, Section 1, 49 Stat. 1380, 5 U.S.C.A. § 597a-1, the name of the bureau was changed to "Bureau of Marine Inspection and Navigation." The Director of the renamed bureau was charged with the duties and powers of the former Commissioner of Navigation under the 1884 statute quoted above. (46 U.S.C.A. § 1 note.) * * *

"The functions of the Bureau of Marine Inspection and Navigation were transferred to the Bureau of Customs by Executive Order No. 9083, effective March 1, 1942, and published in (1942) 7 Fed. Reg. 1609 [50 U.S.C.A. Appendix § 601 note], and the powers of the Bureau of Marine Inspection and Navigation were vested in the Commissioner of Customs by the same order, which was an exercise of the statutory powers granted the President to reorganize the executive branch of the Government."

Going now directly to the question of jurisdiction, we must examine carefully the Hedden and the Laidlaw opinions. The Hedden opinion clearly states that the question of jurisdiction was raised by the court sua sponte. The court said [43 F. 23]: " * * * on the other hand, the labor and responsibility of the court have been increased by the omission of the defendant's counsel to furnish any assistance towards the solution of the questions, and permitting them to pass sub silentio." It is reasonable to conclude that the government assumed the court had jurisdiction. The Attorney General, five years prior to the Hedden decision (18 Op.Atty.Gen. 197, June 12, 1885) held that the Act in question was designed to terminate the right of appellate review formerly existing in the Secretary of the Treasury and the Secretary of State. The tonnage tax and the power of the Commissioner of Navigation were directly at issue in the Hedden case, and the court held that: "Congress has seen fit to constitute him the final arbiter in certain disputes, and congress alone can supply a remedy for any wrong which may have arisen from his construction of the law relating to the collection of tonnage due." 43 F. 25. The court further held Congress had the authority under the court to vest in the Commissioner the power to make final decisions.

Three months after the Hedden decision the Circuit Court for the District of Oregon rendered its opinion in Re Laidlaw v. Abraham, 43 F. 297. The plaintiff claimed the wrongful collection of a tonnage tax and instituted suit. The court at first decided against the plaintiff and held in Re Laidlaw, C.C., 42 F. 401, 403, decided May 13, 1890: " * * * the decision of the commissioner of the navigation appears to be final." However, about three months thereafter the same court reversed its own opinion in Re Laidlaw v. Abraham, 43 F. 297, 299, which was decided August 18, 1890. The question of jurisdiction was directly raised. The defendant filed a general demurrer to the complaint, urging that the facts did not state a cause of action and the court is without jurisdiction. Judge Deady said:

"The only other point made in support of the demurrer is that the decision on the appeal to the secretary was, under the Act

of July 5, 1884, (23 St. 118,) in fact made by the commissioner of navigation, and is by said act made final, and is therefore a bar to this action.

"This act is entitled 'An act to constitute a bureau of navigation in the treasury department.' The commissioner created by it is charged, 'under the direction of the secretary of the treasury' with many duties concerning 'the commercial, marine, and merchant seamen of the United States;' and, by section 3 thereof, 'with the supervision of the laws relating to the admeasurement of vessels and the assigning of signal letters thereto, and of designating their official number; and on all questions of interpretation growing out of the execution of the laws relating to these subjects, and relating to the collection of tonnage tax, and to the refund of such tax when collected erroneously or illegally, his decision shall be final.'

"At first blush it may appear that this provision in the act of 1884 repealed so much of sections 2931, 3011, Rev.St., as gives the person paying such illegal tax the right of redress in the courts, after an unsuccessful appeal to the department.

"But, on reflection, I am satisfied that the word 'final' is used in this connection with reference to the department, of which the commissioner is generally a subordinate part.

"In my judgment, the purpose of the provision is to relieve the head of the department from the labor of reviewing the action of the commmissioner in these matters, to sidetrack into the bureau of navigation the business of rating vessels for tonnage duties, and deciding questions arising on appeals from the exaction of the same by collectors.

"The appeal is still taken to the secretary of the treasury, as provided in section 2931, but goes to the commissioner for decision, whose action is 'final' in the department, as it would not be but for this provision of the statute.

"This being so, and nothing appearing to the contrary, it follows that the right of action given to the unsuccessful appellant in such cases is not taken away. The appeal to the department has simply been decided by the commissioner, rather than the secretary, and, that having been adverse to the plaintiff, his right of action against the collector attaches at once."

Several considerations lead this court to follow the Laidlaw opinion rather than the Hedden opinion.

(1) No appeal was taken by the government, thus creating a strong inference that the government acquiesced in the decision. (2) The court handed down an opinion and after more careful consideration reversed itself. (3) The usual rule is to follow the later decision where two precedents of equal standing are at variance and irreconcilable. (4) The Attorney General of the United States, in advising the President on his power to reverse a decision of the Commissioner, referred to the Laidlaw case and to the right of the aggrieved party to bring an action in the courts. 20 Op.Atty. Gen. 367, March 23, 1892.

Harper v. Charlesworth, 4 Barn. & C. 589; Allen's Estate, 109 Pa. 489, 1 A. 82; Chicago Ry. Co. v. Van Cleave, 52 Kan. 665, 33 P. 472.

Congress has conferred jurisdiction on district courts to hear and determine the question at issue in this case. Judicial Code, sec. 24, as amended, March 2, 1929, sec. 41, Title 28 U.S.C.A. subsec. 5, reads as follows: "Cases under internal revenue, customs and tonnage laws. Fifth. Of all cases arising under any law providing for internal revenue, or from revenue from imports or tonnage, except those cases arising under any law providing revenue from imports, jurisdiction of which has been conferred upon the Court of Customs and Patent Appeals. Mar. 3, 1911, § 24, par. 5, 36 Stat. 1092; Mar. 2, 1929, c. 488, § 1, 45 Stat. 1475".

The term "revenue law," when used in connection with the jurisdiction of the courts of the United States, means a law imposing duties on imports or tonnage, or a law providing in terms for revenue; that is to say, a law which is directly traceable to the power granted to Congress by Sec. 8, Art. I, of the Constitution, "to lay and collect Taxes, Duties, Imports and Excises." United States v. Hill, 123 U.S. 681, 8 S.Ct. 308, 31 L.Ed. 275. A mere expression of finality of decision by the Commissioner of Navigation does not necessarily imply a limitation upon the jurisdiction of the court. "The law is established that when a person by the compulsion of the color of legal process, or of seizure of his person or goods, pays money unlawfully demanded he may recover it back." Arkansas Building Association v. Madden, 175 U.S. 269, 20 S.Ct. 119, 121, 44 L.Ed. 159.

"The words 'Commissioner of Navigation' should read 'Director of the Bureau of Marine Inspection and Navigation'. 'June 30, 1932, c. 314, § 501, 47 Stat. 415; May 27, 1936, c. 463, § 1, 49 Stat. 1380' should be added to this citation." 46 U.S.C.A. § 3.

■ Were the tonnage taxes properly assessed? The provisions of law under which the taxes were assessed are as follows: "A tonnage duty of 2 cents per ton, not to exceed in the aggregate 10 cents per ton in any one year, is imposed at each entry on all vessels which shall be entered in any port of the United States from any foreign port or place in North America, Central America, * * * and a duty of 6 cents per ton, not to exceed 30 cents per ton per annum, is imposed at each entry on all vessels which shall be entered in any port of the United States from any other foreign port, not, however, to include vessels in distress or not engaged in trade." 46 U.S.C.A. § 121. Determination of the port from which the Montebello originated for the purpose of the tax involved is a question of fact. The defendant has failed to plead or prove, nor was there any showing of, deliberate evasion of the higher tax of 6 cents by the Montebello, in directing that part of its voyage from Talara, Peru, via Vancouver, B. C. to the Port of San Luis. The facts favor the position of the plaintiff. Clearing for Vancouver from Peru with a load of crude petroleum was no idle act. Application of the last port and continuous voyage doctrine is flexible and must be confined to the peculiar facts submitted. No advantage of the 2 cent rate could be gained by simply touching a foreign North American port prior to entering a port of the United States. The conditions under which the Montebello's Master was required to file the "Master's Oath on Entry of Vessel from Foreign Port" can lend little weight to defendant's position. The Collector arbitrarily determined the foreign port from which the vessel arrived as Talara, Peru, and refused to accept the Master's Oath on the form which showed the Montebello as arriving from Vancouver, Canada.

■ The Deputy Collector in charge at Port San Luis, California, in his report to the Collector of Customs at Los Angeles, California, stated among other facts: "Upon arriving and discharging cargo only at Vancouver, B. C., on December 17, 1940, the vessel sailed the same day in ballast for Port San Luis, ·Calif., arriving here December 24, 1940, where, after entry, the crew was paid off, crew purchases entered, the Document changed from Register to Enrollment, the voyage officially ended and the vessel engaged in coastwise trade." No argument is needed to prove that if a vessel incidentally is at a foreign intermediate port to secure ship supplies it cannot be said to have entered such a port, but in the instant case the vessel entered, discharged its cargo and cleared from Vancouver, B. C. It entered the United States port of San Luis from Vancouver, B. C. See Treasury Decision No. 11949 and 10379. The Attorney General ruled that where a vessel discharged all of its cargo at Guantanamo, Cuba, and then proceeded to the United States, it was to be considered as coming from Guantanamo. See also: The African Prince, D.C.Mass.1914, 212 F. 552. A vessel enters the United States from that foreign port from which she last cleared.

■ The same rule applies whether the vessel enters from a foreign port in ballast or with freight loaded at the foreign port. . 25 Op.Atty.Gen. 157.

Where the Collector of Customs refuses to accept the Master's. Oath designating the foreign port of entry and demands an Oath designating another port, the Master has little choice but to comply lest he place himself in jeopardy and his vessel subject to forfeiture. Any Master would yield to an illegal demand rather than take such a risk.

"In this case", the defendant urges in its brief "the Master's Oath on entry contained the statement that the voyage began at Talara, Peru". In a similar instance the Supreme Court was not impressed by an admission under compulsion. Justice Brown said: "We are not impressed by the argument that, if the plaintiffs insisted that these sugars were not imported merchandise, they should have stood upon their rights, refused to enter the goods, and brought an action of replevin to recover their possession. It is true that, to prevent the seizure of the sugars, plaintiffs did enter them as imported merchandise; but any admission derivable from that fact is explained by their protest against the exaction of duties upon them as such. They waived nothing by taking this course. The collector lost nothing, since he was apprised of the course they

would probably take." De Lima v. Bidwell, 182 U.S. 1, at page 179, 21 S.Ct. 743, 746, 45 L.Ed. 1041.

The third question must be answered in the affirmative. The action against the Collector of Customs is proper. The Ninth Circuit in Re Border Line Transportation Co. v. Haas, Collector of Customs, 128 F.2d 192, decided May 18, 1942, was an action against a Collector of Customs to recover certain entrance and clearance fees. The Circuit Court for this District has several times stated that it is the duty of the court to first determine the question of jurisdiction in each case and if the same is lacking, to dismiss the action. "It is the duty of a federal court to determine a question of its jurisdiction sua sponte, though not raised by either party." 20 Fed.Dig., Courts, ☞280(5), p. 725, and cases cited. The question of jurisdiction was not raised either by the court or the parties in Re Border Line Transportation Co., supra, and the same was taken foregranted.

See also: Act Feb. 26, 1845, 5 Stat. 727, c. 22; 17 Corpus Juris 642; 25 C.J.S., Customs Duties, § 229; Cosulich Line of Trieste v. Elting, 2 Cir., 40 F.2d 220.

The defendant emphasizes the holding of the court in Cary v. Curtis, 3 How. 236, 44 U.S. 236, 11 L.Ed. 576, decided in January term, 1845, and makes the following comment: " * * * that since the passage of the Act of Congress of March 3, 1839, Chapter 82, Section 2, which required collectors of customs to 'place to the credit of the Treasurer of the United States all money which they receive * * * for duties paid under protest,' an action of assumpsit for money had and received will not lie against the collector for the return of such duties so received by him."

The defendant also cites Arnson v. Murphy, 109 U.S. 238, 3 S.Ct. 184, 27 L.Ed. 920, and Id., 115 U.S. 579, 6 S.Ct. 185, 29 L.Ed. 491. However, fifty-six years after the decision in the Cary case, supra, the Supreme Court in De Lima v. Bidwell, 1901, 182 U.S. 1, 21 S.Ct. 743, 745, 45 L. Ed. 1041, again considered the question. The arguments and the opinion cover 220 pages. The court, speaking through Mr. Justice Brown, said:

"It was held by a majority of this court in Cary v. Curtis, 3 How. 236, 11 L.Ed. 576, that this act precluded an action of assumpsit for money had and received against the collector for duties received by him, and that the act of 1839 furnished the sole remedy. It was said of that case in Arnson v. Murphy, 109 U.S. 238, 240, 3 S.Ct. 184, 186, 27 L.Ed. 920, 921: 'Congress, being in session at the time that decision was announced, passed the explanatory act of February 26, 1845, which, by legislative construction of the act of 1839, restored to the claimant his right of action against the collector, but required the protest to be made in writing at the time of payment of the duties alleged to have been illegally exacted, and took from the Secretary of the Treasury the authority to refund conferred by the act of 1839. 5 Stat. 349, 727. This act of 1845 was in force, as was decided in Barney v. Watson, 92 U.S. 449, 23 L.Ed. 730, until repealed by implication by the act of June 30, 1864,' c. 171, 13 Stat. 202, 214, carried into the Revised Statutes as sections 2931 and 3011. In the same case of Arnson v. Murphy, 109 U.S. 238, 3 S.Ct. 184, 27 L.Ed. 920, it was decided that the common-law right of action against the collector to recover back duties illegally collected was taken away by statute, and a remedy given, based upon these sections, which was exclusive. The decision in Elliott v. Swartwout [10 Pet. 137, 9 L.Ed. 373] was recognized, but so far as respected customs cases (i. e., classification cases) was held to be superseded by the statutes. So in Schoenfeld v. Hendricks, 152 U.S. 691, 14 S.Ct. 754, 38 L.Ed. 601, it was held that an action could not be maintained against the collector, either at common law or under the statutes, to recover duties alleged to have been exacted, in 1892, upon an importation of merchandise, the remedy given through the board of general appraisers being exclusive.

"The criticism to be made upon the applicability of these cases is that they dealt only with imported merchandise and with the duties collected thereon, and have no reference whatever to exactions made by a collector, under color of the revenue laws, upon goods which have never been imported at all. With respect to these the collector stands as if, under color of his office, he had seized a ship or its equipment, or any other article not comprehended within the scope of the tariff laws. Had the sugars involved in this case been admittedly imported, that is, brought into New York from a confessedly foreign country, and the question had arisen

whether they were dutiable, or belonged to the free list, the case would have fallen within the customs administrative act, since it would have turned upon a question of classification.

"The fact that the collector may have deposited the money in the Treasury is no bar to a judgment against him, since Rev. Stat. § 989 provides that, in case of a recovery of any money exacted by him and paid into the Treasury, if the court certifies that there was probable cause for the act done, no execution shall issue against him, but the amount of the judgment shall be paid out of the proper appropriation from the Treasury."

Judgment for the plaintiff as prayed for in the complaint. Plaintiff will prepare findings of fact and judgment in accordance with this opinion.