SALTONSTALL, Collector, v. BIRTWELL.

(Circuit Court of Appeals, First Circuit. March 21, 1895.)

No. 117.

1. CUSTOMS DUTIES—TIME OF PROTEST—PAYMENT ON GROSS ESTIMATE.
   Where gross estimates of duties were made prior to liquidation in accordance with Rev. St. § 2869, and were paid by the importer in order to obtain possession of the goods, no protest was then required, but it was sufficient if the protest was filed within 10 days after the date of the final liquidation. Rev. St. § 2931, and § 3011 as amended, construed. 63 Fed. 1004, affirmed.

2. SAME—"PAYMENT UNDER PROTEST" DEFINED.
   The words "payment under protest," as used in the first part of Rev. St. (2d Ed.) § 3011, as amended, must, by reason of the reference, in the latter part, to section 2931, which defines a protest, be construed to include a payment in connection with a protest; that is, a payment preceded by, accompanied with, or followed by a protest, whichever is permitted by said section 2931.

In Error to the Circuit Court of the United States for the District of Massachusetts.

This was an action by Joseph Birtwell against Leverett Saltonstall, collector of the port of Boston, to recover duties paid under protest. There were two trials of the case, the first resulting in a judgment for plaintiff (39 Fed. 383), which was reversed by the supreme court on a writ of error (14 Sup. Ct. 169, 150 U. S. 417). After a second trial the circuit court again rendered judgment for plaintiff. 63 Fed. 1004. Defendant then brought error to this court.

Sherman Hoar, U. S. Atty., and William G. Thompson, Asst. U. S. Atty., for plaintiff in error.

Josiah P. Tucker (William Odlin, on the brief), for defendant in error.

Before PUTNAM, Circuit Judge, and NELSON and WEBB, District Judges.

PUTNAM, Circuit Judge. The importations in this case were two invoices of iron, arriving in February and March, 1888. The collector, on the respective entries of the goods, made gross estimates of the duties, as provided in section 2869 of the Revised Statutes. These gross estimates were paid in accordance with the classification and rate of duty then assessed by the collector, and which classification and rate of duty were the same determined on when the duties were finally liquidated. The question which the importer seeks to raise is whether the classification and rate were sufficiently favorable to him.

The record finds that, at the times the gross estimates were made, the importer paid the amounts thereof for the purpose of obtaining possession of the merchandise. After the gross estimates had been paid and the merchandise delivered to him the duties on one invoice were liquidated, on the 4th day of April, 1888, and on the same date a protest was filed. On the 10th of April, the duties

on the other invoice were liquidated, and on the same day a protest touching it was filed. No protest was filed at or before the payments of the gross estimates, or until the respective days above named; and only one question arises on this writ of error. The importer claims that the proceedings were governed by section 2931 of the Revised Statutes, and that that section, in connection with other provisions of statute, gave a right of action, provided protests or notices of dissatisfaction were filed, in the form required by it, within 10 days after the respective liquidations, and without any protests at or before the payments according to the gross estimates. The United States claim that section 2931 merely provides additional regulations, and that the importer, to maintain his suit, must show, not only that he complied with it, but also that he complied with the provisions of section 3011 of the Revised Statutes, to the extent of having made payment under protest, which payment under protest the United States define as requiring for this case protests at or before the times the payments were made according to the gross estimates. For the purpose of determining this question, it is not necessary that we should specially examine the nature of a protest at common law, or the legislation prior to the act of 1864, as the nature of the early legislation and the common-law character and use of protests are settled by decisions and rules too familiar to require a lengthy review.

The act approved March 2, 1799 (chapter 22), contained, in section 49 (1 Stat. 664), the following:

"And the collector jointly with the naval officer, or alone where there is none, shall, according to the best of his or their judgment or information, make a gross estimate of the amount of the duties on the goods, wares or merchandise, to which the entry of any owner or consignee, his or her factor or agent, shall relate, which estimate shall be endorsed upon such entry, and signed by the officer or officers making the same. And the amount of said estimated duties having been first paid, or secured to be paid, pursuant to the provisions of this act, the said collector shall, together with the naval officer, where there is one, or alone where there is none, grant a permit to land the goods, wares and merchandise, whereof entry shall have been so made, and then, and not before, it shall be lawful to land the said goods."

This is found re-enacted in section 2869 of the Revised Statutes, already referred to, in all substantial respects the same as originally enacted.

The next act to which we need to refer is that of February 26, 1845, c. 22 (5 Stat. 727), as follows:

"That nothing contained in the second section of the act entitled 'An act making appropriations for the civil and diplomatic expenses of government for the year one thousand eight hundred and thirty-nine,' approved on the third day of March, one thousand eight hundred and thirty-nine, shall take away, or be construed to take away, or impair, the right of any person or persons who have paid or shall hereafter pay money as and for duties under protest to any collector of the customs, or other person acting as such, in order to obtain goods, wares, or merchandise, imported by him, or them, or on his or their account, which duties are not authorized or payable in part or in whole by law, to maintain any action at law against such collector, or other person acting as such, to ascertain and try the legality and validity of such demand and payment of duties, and to have a right to a trial by jury touching the same, according to the due course of law. Nor shall anything contained in the second section of the act aforesaid be construed to authorize the secretary

of the treasury to refund any duties paid under protest. Nor shall any action be maintained against any collector to recover the amount of duties so paid under protest, unless the said protest was made in writing and signed by the claimant at or before the payment of said duties, setting forth distinctly and specifically the grounds of objection to the payment thereof."

It will be seen that this act was not of an affirmative character; that is to say, that it did not itself give a right of action, but simply removed the difficulty arising under the previous statute, with reference to the recovery of duties paid under protest,—a difficulty which was declared by the supreme court in Cary v. Curtis, 3 How. 236. The previous act referred to, that of March 3, 1839, c. 82, § 2 (5 Stat. 348), is now section 3010 of the Revised Statutes, requiring the collector to forthwith place to the credit of the treasury moneys received by him for unascertained duties, as well as for duties paid under protest. Notwithstanding the apparently explicit language of this last-named statute, Chief Justice Taney ruled in Brune v. Marriott, Taney, 132, Fed. Cas. No. 2,052, with reference to importations made in 1848, that the payment of the gross estimate, made in accordance with the act of 1799, already cited, was rather in the nature of a pledge or deposit than a payment, so that protest might legally be made when the duties were finally determined and the amount assessed by the collector. This case came before the supreme court in 9 How. 619, where the judgment below was affirmed, the court saying (page 636):

"But where the duties had not been closed up in any cases, when the written protest in April was filed, though the preliminary payment of the estimated duties had taken place, the court justly considered the protest valid, because, till the final adjustment, the money remains in the hands of the collector, and is not accounted for with the government, and more may be necessary to be paid by the importer."

There was an act passed in 1857 (March 3, c. 98, § 5; 11 Stat. 195) framed somewhat as the act of 1864, which we will hereafter refer to, but limited to the determination of the question whether goods were free or dutiable, as was settled in Barney v. Watson, 92 U. S. 449. This act did not come before the supreme court with reference to any question except that decided in Barney v. Watson, and was not re-enacted in the Revised Statutes, the commissioners' report stating that section 2931 superseded it. Therefore, we need not give it further attention.

The next act to which we need refer was that of June 30, 1864, c. 171, § 14 (13 Stat. 214), re-enacted in section 2931 of the Revised Statutes without change, as follows:

"On the entry of any vessel, or of any merchandise, the decision of the collector of customs at the port of importation and entry, as to the rate and amount of duties to be paid on the tonnage of such vessel or on such merchandise, and the dutiable costs and charges thereon, shall be final and conclusive against all persons interested therein, unless the owner, master, commander or consignee of such vessel, in the case of duties levied on tonnage, or the owner, importer, consignee, or agent of the merchandise, in the case of duties levied on merchandise, or the costs and charges thereon, shall, within ten days after the ascertainment and liquidation of the duties by the proper officers of the customs, as well in cases of merchandise entered in bond as for consumption, give notice in writing to the collector on each entry, if dissatis-

fied with his decision, setting forth therein distinctly and specifically the grounds of his objection thereto, and shall, within thirty days after the date of such ascertainment' and liquidation, appeal therefrom to the secretary of the treasury. The decision of the secretary on such appeal shall be final and conclusive; and such vessel, or merchandise, or costs and charges, shall be liable to duty accordingly, unless suit shall be brought within ninety days after the decision of the secretary of the treasury on such appeal for any duties which shall have been paid before the date of such decision on such vessel, or on such merchandise, or costs or charges, or within ninety days after the payment of duties paid after the decision of the secretary. No suit shall be maintained in any court for the recovery of any duties alleged to have been erroneously or illegally exacted until the decision of the secretary of the treasury shall have been first had on such appeal, unless the decision of the secretary shall be delayed more than ninety days from the date of such appeal in case of an entry at any port east of the Rocky Mountains, or more than five months in case of an entry west of those mountains."

It is claimed by the United States that this act, like the provisions of section 2931, as the latter are interpreted by the United States, gave no right of action, but provided additional regulations, and was merely a limitation of whatever right of action existed previously. There is very much in its frame and history to lead to a different construction of it, and to the understanding that congress intended by it to form an entirely new system touching the topic which it involved, superseding prior legislation. If this were so, the mere fact that a right of action was not given in terms would not necessarily exclude such right, because it could fairly be implied, although not expressly stated, by what is found in the enactment. The apparent purposes of the act were to give ample opportunity for all parties concerned to ascertain and state carefully their rights, and yet within a time sufficiently seasonable to inform the United States and its officers, and thus to relieve from the inconvenience, and the liability to confusion, error, and misunderstanding, inherent in the old system, by which protests must be filed before the merchant could obtain his merchandise, no matter how urgent his necessities nor how brief the time they allowed him. The customary rules of interpretation, applied to this statute in its historical position, would naturally lead to the construction which the importer puts on it. The expressions of the supreme court in Barney v. Watson, 92 U. S. 449, 452, 453, Arnson v. Murphy, 109 U. S. 238, 241, 3 Sup. Ct. 184, and U. S. v. Schlesinger, 120 U. S. 109, 114, 7 Sup. Ct. 442, though perhaps not necessary to the conclusions in those cases, strengthen this view. The mere facts that the act of 1845 was not expressly repealed, and that the next section in the act of 1864 uses the word "protest," would have little weight to the contrary. The notice of dissatisfaction provided in the act of 1864, although given after the duties are paid and the merchandise received, would be in law a protest, as there is nothing in the word itself which always limits it to a proceeding taken before or at the time of the act to which it relates. However, we need not determine the effect of the act of 1864 standing alone, because the question was, we think, settled by subsequent legislation.

It is a common expression that the act of 1845 was reproduced in section 3011 of the Revised Statutes. This is a mistake, as appears

by the commissioners' report, and as results from what is said in Barney v. Watson and Arnson v. Murphy, already cited. Section 3011, as enacted, closed as follows:

"But no recovery shall be allowed in such an action, unless a protest in writing, and signed by the claimant or his agent, was made and delivered at or before payment, setting forth distinctly and specifically, the grounds of objection to the amount paid."

Thus, the Revised Statutes brought together section 2931 and section 3011,—an apparently incongruous result. Congress so determined, because by the act of February 27, 1877, c. 69 (19 Stat. 247), which was expressly passed "for the purpose of correcting errors and supplying omissions in the Revised Statutes," "so as to make the same truly express the laws," section 3011 was amended, so that the closing paragraph now reads as follows:

"But no recovery shall be allowed in such an action unless a protest and appeal shall have been taken as prescribed in section 2931."

These references give all the legislation bearing on the proposition before us; and by admission of the counsel of each party, as well as from our own investigation, the question raised on this writ of error remains to be determined for the first time. Various expressions of the supreme court and various inferences from its decisions may, perhaps, have a tendency one way or the other; but in none of them can it be said that that court had the precise question now before us under consideration. The expression found in U. S. v. Schlesinger, 120 U. S. 109, on page 113, 7 Sup. Ct. 442, may be thought to lead to the view that no payment of duties is within the provisions of section 2931, except one made at or after protest. But the question before us was not under consideration by the supreme court at that time, and this expression was incidental.

It is conceded that, as the law thus stood, giving full effect to section 2931, and section 3011 as amended, an importer could not recover unless the payment made by him was in order to obtain possession of his merchandise. The case finds that the payments in this case were thus made. It is also claimed by the United States, as already said, that the "payment under protest," described in section 3011, means a protest made at such a time as was required by the common law in order to maintain an action for duties wrongfully assessed; in other words, a protest made at or before the time of payment. The importer says that, even if this be true, the duties in this case were not paid until they were liquidated. He relies on Brune v. Marriott, Taney, 132, Fed. Cas. No. 2,052, and the same case in 9 How. 619, to which we have already referred. The syllabus prefixed to the case by Mr. Howard, the supreme court reporter, contains the following expression:

"But if the protest be made in a single case with a design to include subsequent cases, and the money remains in the hands of the collector without being paid into the treasury, and it was so understood by all parties, such a protest will entitle the importer to recover the money from the collector."

The revised syllabus found in 18 Curt. Dec. 283, covers the point under discussion, but omits the facts specially stated by Mr. Howard. Judge Curtis, however, in Warren v. Peaslee, 2 Curt. 231, 236, Fed. Cas. No. 17,198, about five years after the decision of Brune v. Marriott on appeal, considers that case; and, although he speaks of it with reference to a point other than that which arises here, he says, generally:

"The circumstances of that case were very peculiar, and they are relied on by the court as the reasons for the decision, at which they manifestly felt great difficulty and hesitation in arriving."

We refer, also, to the views of Judge Nelson, expressed in 1859, in Crocker v. Redfield, 4 Blatchf. 378, Fed. Cas. No. 3,400, where, with reference to a payment under section 3010, he says that "the money deposited was to be applied by the collector to the duties, and it cannot be said after this that it was paid compulsorily in order to get possession of the goods." He closes that a protest after the duties were ascertained came too late. As Judge Nelson was on the bench of the supreme court when Brune v. Marriott was determined, he must have understood the effect of that decision. Moke v. Barney, 5 Blatchf. 274, Fed. Cas. No. 9,698, states the practice at the custom house in New York as defendant in error claims the law to be; but the case itself is not in point, and the expressions of Judge Nelson on pages 277 and 278, 5 Blatchf., and Fed. Cas. No. 9,698, are in harmony with Crocker v. Redfield.

The act of 1845 had no reference to any moneys except those paid "as and for duties under protest." Notwithstanding other changes from the act of 1845, found in section 3011 of the Revised Statutes, this expression was saved in the words there existing, "payment under protest" "of any money as duties." Both statutes also contain the limitation that the payment must be made "in order to obtain possession of the merchandise imported." In Porter v. Beard, 124 U. S. 429, 8 Sup. Ct. 554, it is directly held that, under the Revised Statutes, the importer is limited to the recovery of moneys paid "in order to obtain possession of the merchandise"; and U. S. v. Schlesinger, 120 U. S. 109, 113, 7 Sup. Ct. 442, is of the same effect. In the case at bar the payments to obtain possession of the merchandise were made at the times of the gross estimates, and if, as claimed by the importer, the payments of the duties were not made until they were liquidated, then there has been no payment by the importer "of any money as duties" "in order to obtain possession of the merchandise imported." The importer, by his proposition on this point, puts himself and the court to the dilemma of maintaining and holding that the payment of his money "as duties" was after he had obtained possession of his merchandise; so that it would be apparently impossible for him to meet the first requirement of the law. Notwithstanding the reliance placed by the importer on Brune v. Marriott, which, if applied to the case at bar, might result fatally to him, we think our safe course is to adhere to the plain letter of the statute, and determine that the moneys paid in at the times of the gross estimates were duties, either unascertained or paid under protest, as nominated in section

2869 of the Revised Statutes, and that the duties to which this writ of error relates were paid at those times, and not when the final liquidations were made.

Having disposed of this question, the case comes, we think, directly to a conclusion in harmony with that of the circuit court, although, in view of the plain error, afterwards admitted by congress, in combining sections 2931 and 3011 in the Revised Statutes, and of the peculiar method by which this error was in part corrected in 1877, it is not easy to reconcile, if taken in their primary and natural sense, the words "payment under protest," in the first part of section 3011. It must be admitted that these words, although having relation in section 3011 to a merely statutory regulation, are presumptively to find their interpretation in the common law, and thus they primarily and naturally intend, in this and like connection, where a protest lays the basis of an action for money paid, a protest made before or at the time of the act protested against. Yet, as section 3011 originally stood, these words, "payment under protest," were not left to be ascertained from the common law, but they were expressly defined in the latter part of the same section by the words "unless a protest in writing, and signed by the claimant or his agent, was made and delivered at or before the payment." Therefore, we find in this section a precise, legislative definition of the words "payment under protest." By the act of 1877 this legislative definition was taken out, and another substituted; that is to say, a protest or notice made and given as prescribed in section 2931. The following expressions of Chief Justice Marshall in Alexander v. Alexandria, 5 Cranch, 1, 17, seems very apt in this connection:

"If, in a subsequent clause of the same act, provisions are introduced which show the sense in which the legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases. Consequently, if a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law."

Of course, congress might have provided, as apparently it did by the Revised Statutes as they stood before the amendment of 1877, that not only should a protest be made within 10 days after liquidation, but that one should also be made at or before payment. In other words, it might have required, as claimed by the United States, and, perhaps, before the amendment of 1877 did require, a double limitation as to time. But, if congress intended to retain the law in this form, it is to be presumed that it would not have stricken out the clear words "at or before the payment," although it left standing the expression "payment under protest." By electing to strike out, as between these two, the one that was unmistakable, it declared its intention as certainly, though not as clearly, as though it had stricken them both out. As the section now stands, "payment under protest" must be construed to mean other than its natural and primary sense, and to include a payment in connection with a protest; that is, a payment preceded by, accompanied with, or followed by, a protest, whichever is permitted by section

2931. This is one of the instances where a purely literal construction of one part of an enactment must yield to the undoubted intention of the legislature, expressed in another part. Examples supporting a construction of statutes with this result are not infrequent. One of them is found in Davies v. Miller, 130 U. S. 284, 9 Sup. Ct. 560, touching this very section 2931, by which the words "within ten days" are diverted from their natural and primary meaning, so as to include a period anterior to the "ten days." As stated in substance by the learned judge of the circuit court, congress, at the close of section 3011, before it was amended, and again when it was amended, defined the nature of the protest named in the first part of the same section, as well as the circumstances under which it was to be made. Originally, it was required to be made at or before the time of payment, and now within the time provided in section 2931, whatever it may be.

We have referred to the fact that the United States question the construction of the act of 1864, to the extent that they claim it gave no new right of action, and that after it was passed, and before the enactment of the Revised Statutes, a protest at or before the time of payment was necessary. While we have already said that we lean against this construction, we concede that, as it stood originally, there was doubt on these propositions. The construction of it, as it stood in the Revised Statutes as originally enacted, we need not consider. But the act of 1877, by striking out the expression found in the act of 1845, and also in section 3011 of the Revised Statutes, "at or before the payment," has presumably declared that the notice or protest, as thereafterwards required by section 2931, may be given at any time prior to the expiration of 10 days from liquidation, whether before or after the payment of duties. As already said, this answers all the purposes of the United States, and gives its executive officers information sufficiently seasonable for their action.

In this connection, we call attention to the fact that the words "payment under protest," appearing in the early part of section 3011, would permit an oral protest, as well as a written one. To prevent a reversal of the declared policy of the United States, in existence continuously in every direction since 1845, adverse to parol protests, the definition of this expression which was made in the last part of the same section became necessary. But, on the view of the United States of the law as it now stands, the importer has his option to file at or before payment of duties a single, consolidated written protest or notice of dissatisfaction (Davies v. Miller, 130 U. S. 284, 9 Sup. Ct. 560, already referred to) if within the 10-days period; or, following the literal construction insisted on by the United States, he may make an oral protest at or prior to the payment of duties, to be followed by a written notice of dissatisfaction later, within the 10-days period. In other words, the position of the United States on the point in controversy leaves standing, and of some effect, a provision which includes every form of protest known to the common law, with the rest an oral one. Experience has shown such a protest of no value, and that it

leads to misunderstandings and errors, and congress has so impliedly declared. Our views already expressed are therefore strongly re-enforced by the violent presumption that it cannot be supposed congress intended to revive, for any purpose, the oral protest, abolished so many years ago, and so constantly provided against by legislation.

Whatever else might be said about the evidence of Miss Kenrick which was excepted to, our conclusions render it immaterial and harmless.

The judgment of the circuit court is affirmed.