Campbell, Chief Justice,
delivered the opinion of the court:
This case has been before the court several times. At one time it was decided against the plaintiff, who made a motion for a new trial. Pending that motion a considerable number of other cases were submitted, while still others were awaiting hearing, all of which involved the general question of the effect to be given settlements between the Director General of Railroads and the railroad companies. That being one of the questions in this case, the court referred this and other submitted cases of similar kind to a special commissioner for a full examination and report, authorizing him to take and hear additional evidence that might be adduced and to make a report of his findings and the evidence. This the special commissioner has done. In the order of reference it was provided that upon the coming in of the commissioner’s report the parties in each of the cases, within a stated time, could file exceptions to any of his findings or conclusions. In the instant case exceptions were filed. The case has been heard upon the report, exceptions thereto, and the record. Those exceptions by both parties are overruled and the report of the special commissioner is confirmed. As required by the rules, the court has made findings of fact based upon this report and the evidence. The facts now found are materially different from those developed in former hearings, and so far as the question of the director general’s settlement is concerned present a substantially different case from that made in the earlier hearings. It becomes necessary to review them.
The petition was filed December 8, 1920, by the Philadelphia & Reading Railway Co., which rendered the transportation services out of which the matters here involved arose. The Reading Company, as the successor of this plain *150 tiff company, has been substituted as party plaintiff. This-substitution arose after the services were rendered and after all the questions involved in the case had arisen, but for brevity the term plaintiff will be used as inclusive of the original party, the Philadelphia & Beading Bailway Co.
For transportation services rendered for the Government by the plaintiff’s companies bills were rendered in due course' by the carrier to the proper disbursing officers. These bills were rendered long prior to the date of the passage of the railroad into Federal control in December, 1917, but payments of them had not been made at that time. It was. while the plaintiff company’s properties were being oper ated by the Director General of Bailroads that checks of the disbursing officer to the amount of $26,157.20 were drawn by this officer payable to the Philadelphia & Beading Bailway Co., and intended to be in payment for the transportation services mentioned. The director general had utilized the services of the administrative and accounting officers of the railroad companies in large degree by retaining them in his service. Whether because of this condition or because the collection of such outstanding bills as these came within the contemplation of the law or the understanding of the parties, the proceeds from the checks went into the director general’s accounts. The proceeds arising from the operation of the roads during Federal control became the property of the United States. Act of March 21, 1918, section 12, 40 Stat. 457; Dupont Co. v. Davis, 264 U. S. 456. Debts due the carriers at the time Federal control began occupied a different position. No question has been or can be raised as to his right to receive the payment at the time it was made. At that time, however, the agreement between the director general and the railroad companies that was authorized by the act of March 21, 1918, 40 Stat. 451, had not been executed. For this reason, probably, the method of making entries on the books under specific accounts was held in abeyance. While the collection of the items appeared in proper form, there was at the time no specific credit given on an account with the plaintiff.'
*151 After Federal control began the director general presented bills to the accounting or disbursing officers for transportation services rendered the Government by him upon plaintiff’s lines. In the meantime, and before the director general’s bills had been audited for payment, it was determined by the Auditor for the War Department in his audit of the disbursing officer’s accounts that this officer had overpaid plaintiff’s bills in the checks issued as stated and collected by the director general. The claim of the auditor, was based upon a decision of the Comptroller of the Treasury that in the movement of troojis of the Government the-carriers were required to furnish free transportation of impedimenta on the basis of one car for each 25 men. The amount of this supposed overpayment was $14,236.04, and as a means of correcting it the course adopted by the accounting officers was to withhold payments of amounts due upon the director general’s bills for services on plaintiff’s lines until these withheld amounts equaled the amount of the supposed overpayment on plaintiff’s bills. The director general’s bills were accordingly underpaid from time to time or deductions were made from them to the amount of $14,-236.04. While such a course, if unobjected to and allowed to stand, would reimburse the Government to the extent of the supposed overpayment on plaintiff’s bills, it would accom-. plish this result at the expense of the director general’s bills unless credit be given him in a like amount against the sum he received upon plaintiff’s account. As a matter of fact, as hereinafter stated, the director general did account for the net sum remaining after deducting from the amount of the collected checks the amount of the underpayments of or deductions from his own bills. In this connection it may be observed that one of the important differences between the facts now found and those in the former hearings is that contrary to what appeared formerly when the disbursing officer’s checks for plaintiff’s bill were received there was in fact no entry made of credit to plaintiff company, nor was a charge or debit made upon the books against plaintiff for the underpayments of the director general’s bills. The matter, so far as actual book entries are concerned, was in abeyance, except, as already stated, the fact of the receipt of the *152 proceeds of the checks properly appeared in the director general’s books. It was not until the 18th day of February, 1920, within a few days of the date fixed for the termination of Federal control, that an agreement such as was authorized by the act of March 21, 1918, was entered into between the director general and the plaintiff (the Philadelphia & Reading and affiliated companies). This agreement mentions the properties taken under Federal control and does not expressly name uncollected assets of the companies arising out of transactions occurring or services rendered prior to Federal control. There is at least, however, an implied recognition of them in the provision of the agreement relative to the accounting by the director general for all amounts received by him “ in cash or collected * * * by him from current operating assets belonging to the companies,” and also in the requirement that at the end of Federal control the director general shall return to the companies all uncollected accounts received by him from them, as well as by other provisions of the agreement and the act under- the authority of which it ivas made.
On the 80th day of June, 1922, an agreement, designated final settlement, was entered into between the director general and plaintiff’s companies. Its declared purpose was to evidence a complete and final settlement of “ all demands of every kind * * * as between the parties * * * growing out of the Federal control of railroads,” except some specified matters not material here. On or about August 25, 1920, preceding the final settlement mentioned, a settlement had been made between the War Department and the director general of all unsettled accounts for transportation furnished during the period of Federal control, the War Department paying him the sum of more than thirty-eight millions of dollars."
By the petition here filed, as above stated, in December, 1920, recovery is sought for the amounts alleged to have been deducted from plaintiff’s bill because of the comptroller’s ruling (24 Comp. Dec. 774) relative to free transportation of impedimenta accompanying troop movements,the petition also claiming additional amounts which it is alleged the disbursing quartermaster deducted from its bills “as *153 if the shipments had consisted of emigrant movables under current rulings of the comptroller.” These two general classes of claims will be considered separately.
1. As to the right to a deduction from plaintiff’s bills for services rendered prior to Federal control because of the comptroller’s ruling to the effect that the Government was entitled to a free car for each 25 men (24 Comp. Dec. 774), this court has in several cases held the opposite view to be correct. The Government has accordingly been required to pay sums disallowed by the accounting officers upon the theorjr mentioned. If, therefore, the sum of the items involved in this branch of the case, namely, $14,236.04, had been deducted from plaintiff’s bills and Federal control had not intervened theré can be no question that plaintiff would be entitled to recover the amount of the deduction. See Missouri Pacific R. R. Co., 56 C. Cls. 341. Under the facts'" now appearing from the findings we think that the right of recovery is unimpaired by the intervention of Federal control or by the settlement between the parties relative to Federal control. To make plain our views on this question may involve some repetition of facts already stated and we repeat them for the further reason that facts appear in some other cases of this class that may call for a differentiation^ of this case. The items in plaintiff’s bills involved in this 1 case were for services rendered prior to Federal control. They were not paid to plaintiff, but checks for them were collected by the director general amounting to $26,157.20. Included in this amount is $1,257.19, concerning which there is no controversy, and there remains after deducting it $24,900.01. These collections by the director general were during the year 1918, between the dates February 2 and June 12, and, therefore, were prior to the decision of the comptroller mentioned (24 Comp. Dec. 774), rendered June 18, 1918. These dates are important in considering the effect to be given the action of the director general in crediting plaintiff with the difference between his collection in 1918 of plaintiff’s bills and the amounts subsequently-withheld from his own bills by the accounting officers under the operation of the comptroller’s ruling. Owing no doubt to the great number of bills coming before them during the *154 periods in question the accounting officers did not conclude the auditing of the director general’s bills for transportation by him over plaintiff’s lines until long after the payment on plaintiff’s bills had been made, but on June 18, 1918, the decision of the comptroller had been rendered. Whilst these collections of plaintiff’s bills were made in 1918, and before this decision, it was not until divers times during 1920 that the director general’s bills were subjected to the stated underpayments or deductions. In the meantime he held the proceeds of the collections subject to a proper accounting with plaintiff. That decision was, of course, controlling upon the accounting officers and reasonably enough the director general would not seek to question it. If he did not accept the comptroller’s views he manifestly would take upon himself the burden of establishing the contrary. The natural thing for him to do was to leave the matter where the action of the accounting officers placed it and hold himself responsible to plaintiff for what remained after applying the accounting officer’s claim. This course would not prevent plaintiff subsequently asserting .its claim against the Government for the amount withheld, but would leave the plaintiff and the Government free to settle their own differences. And as bearing further on the reasonableness of this course by the director general, it may be noted that it was after the transactions mentioned had occurred — after the collections by him and the subsequent underpayments of or deductions from his own bills— that this court decided that the ruling of the comptroller was erroneous. See Missouri Pacific Railroad Co. case, supra, decided June 13, 1921. Thus the ruling of the comptroller, until authoritatively held erroneous by the courts, was binding upon the parties concerned during the times involved in the collections and in the underpayments or deductions, and there was no legal duty upon the director general to question its correctness so far as these items were concerned. When notified, as already stated, that he had been overpaid „by the disbursing officer on plaintiff’s bills, and while he yet had in possession and control the collections, not having paid them over to plaintiff, he could with perfect propriety accede to the demand for a return of the *155 supposed overpayments. See Story on Agency (9th ed.), par. BOO; Cary v. Curtis, 3 How. 236, 249.
If it were necessary to find that the companies in whose right the collection was made had acquiesced in or ratified the director general’s action in submitting to the deduction from his own accounts in order to reimburse the Government for the supposed overpayments, it would seem that such a finding would be supported by the fact that after the underpayments or deductions were made the plaintiff brought this suit in which it treats these deductions as though made from its own accounts. We are not left in uncertainty as to what occurred with reference' to these items of collection when the preliminary statements of accounts incident to the final settlement and the settlement itself were concluded in June, 1922. The facts definitely show that in the class of items called corporate transactions there was credited to plaintiff an item of $10,663.91, which is the exact difference between the entire amount collected, as already stated, $24,900.01, upon plaintiff’s bills and the underpayments or deductions from the director general’s bills. These “corporate transactions” were of things occurring prior to Federal control. It thus is certain that the director general had accounted to the plaintiff for the balance in his hands of his collection of the plaintiff’s bills mentioned. The Government having made itself whole by underpaying, or deducting from the director general’s bills the supposed overpayments on plaintiff’s bills, and the director general having accounted to plaintiff only for the balance, it is manifest that the plaintiff is the only person who can complain. It now treats the deductions as made from its own bills, and this is the effect of what was done. It sues to recover the amount of these deductions, which, as stated above, amount to $14,236.04, and we think it should recover this sum.
2. The other items of claim set up in the petition arise out of alleged deductions from plaintiff’s bills made by the disbursing officer before paying any part of them. It is claimed not only that the deductions were improper but that they were made before the checks already mentioned were issued. The facts show, however, that bills were pre *156 sented to the disbursing officer stated according to certain tariff charges, which that officer notified plaintiff he was not authorized to pay. Thereupon the plaintiff’s bills were voluntarily restated upon the basis of Class D rates, and as thus restated the bills were paid without objection or protest by plaintiff. This branch of the case is controlled by the decided cases. See Oregon-WasMngton R. R. Co., 255 U. S. 339; 54 C. Cls. 131. Baltimore & Ohio R. R. Co., 52 C. Cls. 468.
The plaintiff should have judgment for the items involved in the first branch, $14,236.04, but as to those in tire second branch, the petition should be dismissed. And it is so ordered.
GRAham, Judge; Hat, Judge; DowNet, Judge; and Booth, Judge, concur.